908 So.2d 350 (2005)
Donny L. CROOK, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-455.
Supreme Court of Florida.
July 7, 2005.
*351 James Marion Moorman, Public Defender and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Candance M. Sabella, Assistant Attorney General, Tampa, FL, for Appellee.
*352 PER CURIAM.
Donny L. Crook, a defendant who was convicted of first-degree murder, appeals a circuit court judgment sentencing him to death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we reverse Crook's death sentence and remand the case for the imposition of a sentence of life imprisonment without the possibility of parole to be served in addition to the two life sentences for convictions we have previously affirmed arising out of the same circumstances.

BACKGROUND
Crook was tried and found guilty of first-degree murder, robbery with a deadly weapon, and sexual battery. Crook v. State, 813 So.2d 68, 69 (Fla.2002). The evidence presented at trial that he brutally killed the victim, the co-owner of the bar where the robbery and murder occurred, is unchallenged. Id. However, at the penalty phase, Crook's mother and numerous mental health professionals presented uncontroverted mitigation testimony for the defense. Id. at 70-73. During deliberations, the jury returned to the courtroom with a question as to whether a life sentence without parole really meant life.[1] The trial court declined to answer the question. Subsequently, by a seven-to-five vote, the jury recommended that Crook receive the death sentence for his murder conviction. 813 So.2d at 69. After finding three statutory aggravators, the trial court imposed a death sentence for the murder and concurrent life sentences for the two noncapital convictions. Id. at 73-74, 78.

First Appeal
In the first direct appeal opinion, this Court affirmed Crook's multiple convictions and explained:
The first-degree murder conviction was predicated on alternative theories of premeditated murder and felony-murder with the underlying offenses of robbery and sexual battery. The jury returned a general verdict of guilty of first-degree murder, as well as guilty verdicts on the separate charges of robbery and sexual battery. We find that there is competent substantial evidence to support the jury's verdict in this case.
Id. at 70 n. 1. In that appeal, Crook did not challenge his convictions or the substantial aggravation involved in the crime. Id. at 69. Rather, he asserted three claims with respect to his penalty phase: (1) the trial court erred in failing to address and weigh his brain damage as mitigation; (2) the trial court erred in not finding that his intelligence level was borderline retarded; and (3) that despite substantial aggravation, the death sentence was disproportionate because his case, when properly evaluated, was one of the most mitigated. Id. at 74.
We found merit in Crook's claim on mitigation, and, in an opinion remanding the case for reconsideration of the mitigation and sentence, we detailed the voluminous evidence of mitigation presented during the penalty phase. Id. at 70-73. For example, we summarized Crook's mother's testimony that her first husband severely abused Crook, that Crook sustained head injuries at age four when he was beaten with a metal pipe, that subsequently Crook failed kindergarten and posed substantial discipline problems in the ten different schools he had attended "by the time he reached sixth grade and finally dropped out of school in eighth grade," and that by *353 age twelve Crook began using alcohol and drugs and huffing paint. Id. at 70.
We also discussed the substantial and unrebutted evidence of brain damage and other mental defects that the mental health experts related to the instant murder. Our opinion recounted the testimony of Dr. David McCraney and other mental health professionals. Dr. McCraney opined that "Crook suffered from an impulse control disorder or organic brain syndrome affecting Crook's frontal lobe." Id. He testified that Crook's school records indicated "that Crook was mildly mentally retarded." Id. at 71. Dr. McCraney stated that "Crook was under the influence of an extreme mental or emotional disturbance at the time he committed the crime, and that his brain damage was responsible for this." Id. Importantly, "Dr. McCraney concluded that the circumstances surrounding the homicide were consistent with his diagnosis of frontal lobe brain damage, stating, `[T]he events do appear to conform to this blind animalistic rage that's described with the orbital frontal syndrome.'" Id.
Dr. Ralph Dolente also testified that Crook suffered from frontal lobe brain damage, most likely resulting from trauma sustained when he was beaten as a child with a pipe. Id. Like Dr. McCraney, Dr. Dolente concluded that due to his frontal lobe brain damage, Crook was impulsive and prone to overreact and to rage attacks. Id. at 71-72.
We also detailed Dr. Thomas McClain's testimony. Dr. McClain stated that five factual factors interacted with each other to cause Crook's frontal lobe brain damage: "(1) genetic factors; (2) socioeconomic deprivation; (3) head trauma; (4) substance abuse; and (5) and [sic] birth trauma." Id. at 72. Dr. McClain noted that "Crook's brain damage would `render him hypersensitive to the usual negative effects of alcohol and other drugs.'" Id. After reviewing Crook's IQ tests from his childhood, Dr. McClain opined that the scores, which ranged from 62 to the low 70s, revealed that "Crook suffered from borderline intellectual functioning." Id. Dr. McClain opined that "Crook was under extreme mental or emotional distress at the time of the offense" due to Crook's increased sensitivity to intoxication and to "all of the factors ... that have made him what he is today, namely his brain damage problem." Id.
We summarized Dr. William Kremper's psychological evaluation which took place some two years prior to the murder and which, by agreement of the parties, was submitted to the trial court for its review. Id. at 72-73 & n. 2. Dr. Kremper examined Crook in 1994 as part of a social security disability determination and found that Crook had "a full scale IQ of 66," which placed him in the "mild range of mental retardation." Id. at 72.[2] Dr. Kremper opined that Crook's frustration tolerance was severely limited, such that Crook was inclined to become physically aggressive with minor frustration. Id. at 73. "Dr. Kremper also opined that Cook `experienced auditory and visual hallucinations which appeared to result from extensive substance abuse and head injuries.'" Id.[3]
*354 Finally, after reviewing the "uncontroverted evidence of brain damage, mental retardation, and the age of the defendant," we found that the trial court had not properly or fully considered this evidence in determining Crook's sentence:
We are not certain whether, if the trial court had properly considered the brain damage and borderline mental retardation and the effect of these mental mitigators on the crime in question, the trial court would have found that the aggravation outweighed the mitigation, especially in light of the abundance of nonstatutory mitigation.
... [W]e vacate the sentence of death and remand the case to the trial court to reconsider and reweigh all available mitigating evidence against the aggravating factors, and to determine the proper penalty in accordance with Florida law.
Id. at 77-78 (citations omitted). In concluding that the case must be remanded for reconsideration of the extensive mitigation, this Court did not reach the issue of proportionality. Id. at 78 n. 8. However, we affirmed both the convictions and the life sentences imposed for the two other felony convictions. Id. at 78.

RESENTENCING
On remand, the trial court conducted another sentencing hearing, during which the prior evidence of mitigation was supplemented with the testimony of two mental health experts.
Dr. Elizabeth McMahon, a psychiatrist, testified that Crook suffers from damage to the left side of his brain and possibly the right side as well. She compared his personality development to that of a three-or four-year-old. She hypothesized that Crook suffers from frontal lobe damage which could have been caused at birth or during the incident when he was beaten with a pipe. She reviewed a report noting that after the pipe beating, Crook switched from being right-handed to left-handed. Dr. McMahon observed Crook to be socially limited and to be without coping mechanisms. She opined that because of his frontal lobe damage, he does not have the ability to modulate his impulses. She summed up Crook's physical condition as an axis one diagnosis of organic brain damage.
Dr. McMahon commented that the crime scene in this case showed evidence of a great deal of energy expended on the victim's murder. Crook told her that he attacked the victim pursuant to a conversation in which the victim made some upsetting comments about his family. Crook reported that he stomped on the victim's face, but remembered nothing else. Crook also told her that he tried to make the incident look like a robbery. Dr. McMahon attributed his actions to his mental defects and his "inordinate attachment to some members of his family." Dr. McMahon concluded that when Crook gets angry, he strikes out because he cannot differentiate between a feeling and a behavior. She also related that before the murder Crook consumed a great deal of beer, smoked crack cocaine, and smoked four joints of marijuana laced with heroin.[4] *355 She stated that those chemicals would have certainly affected his already impaired brain in explaining his conduct at the time of the murder.
Dr. Kremper also testified at the resentencing hearing, utilizing his complete review of the records about the case, including his evaluation in 1994 of Crook's total disability for employment purposes and his illiteracy; Crook's prior medical records; consultations with other doctors; and his additional psychological evaluation and testing of Crook in 1998. Dr. Kremper stated that his conclusion from his earliest evaluation in 1994 was that Crook had attention deficit hyperactivity disorder that could be related to organic brain dysfunction caused by head injuries and substance abuse. Dr. Kremper also related that Crook stayed in the hospital for eight days after his birth, likely because his mother was recovering from a Caesarian section, but stated that a loss of oxygen at birth was probably a consideration. Records indicate that at age five, Crook was having trouble concentrating and was taking Ritalin for his disorder. Dr. Kremper stated that Crook's personal history of abuse and trauma, combined with his use of alcohol and drugs and history of huffing paint, would have a major impact on frontal lobe functioning. He deferred to other experts as to a diagnosis of organic brain damage. However, he testified that he now believed his earlier diagnosis in 1994 of mental retardation was wrong, and that Crook's low test scores were attributable to his extensive use of drugs, his agitation and poor attention span, or his malingering in refusing to properly respond to questions.
After the resentencing hearing, the trial court again imposed a sentence of death, and found three aggravators: (1) the murder was committed in the course of, in an attempt to commit, or in flight after a sexual battery; (2) the murder was committed for pecuniary gain; and (3) the murder was heinous, atrocious, or cruel (HAC).
The trial court found a number of statutory mitigating factors: (1) the defendant's age of twenty at the time of the murder (slight weight); (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance (significant weight); (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (significant weight); and (4) the existence of an additional eighteen factors in the defendant's background that would mitigate against the imposition of the death sentence.
The background factors were listed as: (a) the defendant's psychological and emotional age was less than his twenty years (moderate weight); (b) the defendant shares reciprocal love with his family (slight weight); (c) the defendant has never had a peer group relationship (not proven); (d) the defendant is borderline men tally retarded (low range of intelligence and learning disabilities proven, moderate weight); (e) the defendant was predisposed to a subnormal life performance (moderate weight); (f) the defendant was delivered by Caesarian section, causing problems to him (not proven); (g) the defendant has spent his life in poverty (slight weight); (h) the defendant was sickly as a child (not proven); (i) the defendant had an unstable home life (moderate weight as in (e)); (j) the defendant had no role model in his life (moderate weight as in (e) and (i)); (k) the defendant was emotionally and physically abused (previously considered as part of other mitigation topics and weight already assigned); (l) the defendant exhibited signs of brain damage and psychological dysfunction by age five (previously *356 considered as part of other mitigation topics and weight already assigned); (m) the defendant's educational attempts were frustrated early (slight weight); (n) the defendant began abusing drugs at age eight (slight weight); (o) the defendant suffered trauma due to the deaths of close relatives when he was young (slight weight); (p) the defendant has previously been hospitalized for suicidal behavior (proven to the extent it was established as part of the statutory mitigation in (2) and (3)); (q) the defendant was emotionally impaired because his mother was a prostitute and his troubled brothers often cared for him (moderate weight); and (r) the defendant's prior criminal activity is devoid of violent behavior (slight weight).
The trial court also made findings as to numerous nonstatutory mitigators: (1) the defendant did not flee after the offense was committed (slight weight); (2) the defendant did not resist police and cooperated with them (slight weight); (3) the defendant expressed remorse in a confession (slight weight); (4) the defendant was under the influence of alcohol and drugs at the time of the offense (previously considered and given weight under statutory mitigators); (5) the defendant displayed good courtroom behavior (slight weight); (6) the defendant should be given mercy (slight weight); and (7) society can be protected by giving a life sentence (not proven).

PROPORTIONALITY
Crook now challenges the proportionality of his death sentence in this appeal. Crook maintains that the imposition of the death sentence in his case is disproportionate because his crime, while substantially aggravated, is not one of the least mitigated, and in fact, is one of the most mitigated. He maintains that under this Court's case law on proportionality, these circumstances require that his sentence be reduced to life without the possibility of parole. We agree.
In Urbin v. State, 714 So.2d 411 (Fla.1998), we explained our proportionality review:
Proportionality review "requires a discrete analysis of the facts," Terry v. State, 668 So.2d 954, 965 (Fla.1996), entailing a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis. We underscored this imperative in Tillman v. State, 591 So.2d 167 (Fla.1991):
We have described the "proportionality review" conducted by this Court as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). The requirement that death be administered proportionately has a variety of sources in Florida law, including the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, Fla. Const.
. . . Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.

Id. at 169 (alterations in original) (citations and footnote omitted). As we recently reaffirmed, proportionality review involves consideration of "the totality of the circumstances in a case" in comparison *357 with other death penalty cases. Sliney v. State, 699 So.2d 662, 672 (Fla. 1997) (citing Terry, 668 So.2d at 965).
Urbin, 714 So.2d at 416-17.
Further, this Court has consistently held that because death is a unique and final punishment, the death penalty must be reserved only for those cases that are the most aggravated and least mitigated. Kramer v. State, 619 So.2d 274, 278 (Fla. 1993). In Almeida v. State, 748 So.2d 922 (Fla.1999), we explained: "Thus, our inquiry when conducting proportionality review is two-pronged: We compare the case under review to others to determine if the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders." Id. at 933. Hence, our proportionality review requires us to consider the facts and circumstances in Crook's case to determine whether the case is among the most aggravated and least mitigated so as to justify the imposition of death as the penalty.
As to the first prong, relating to aggravation, Crook has conceded, and we agree, that the trial court's finding of three aggravators is supported by the record and those findings place this case among the most aggravated of murders. Accordingly, under our death penalty jurisprudence as stated in Almeida and other decisions, we are next required to determine whether this case also falls within the category of the least mitigated of murders for which the death penalty is reserved.
Notably, this Court has previously vacated death sentences, especially in cases where substantial mental health evidence established the case as among the most mitigated. For example, in Cooper v. State, 739 So.2d 82 (Fla.1999), this Court found that despite the existence of substantial aggravation, there was substantial mitigation, making the death penalty disproportionate under our case law. Id. at 85-86. While we noted the important mitigators of age and abusive childhood, as well as an eight-to-four jury vote on punishment, we particularly emphasized the extensive mental health mitigation in our analysis:
In the present case, as noted above, the trial court found that three aggravators had been established, i.e., commission of a prior capital or violent felony (based on a robbery-murder Cooper committed several days after the present crime), commission during a robbery and for pecuniary gain, and CCP. This Court in other capital cases has affirmed the death penalty where comparable or less aggravation was present. Thus, the first prong of the above standard appears to be satisfied.
The trial court additionally found that two statutory and several nonstatutory mitigators were established, including Cooper's low intelligence (i.e., Dr. Schwartz testified that Cooper's test results placed him in the borderline retarded category) and his abusive childhood. This Court has reversed the death penalty in cases where multiple aggravators were posed against comparable mitigation. In addition to the evidence of brutal childhood, brain damage, mental retardation, and mental illness (i.e., paranoid schizophrenia) in the present case, the defendant was eighteen years old at the time of the crime and had no criminal record prior to the present offense. We note that the jury vote was eight-to-four. On this record, we cannot conclude that the present crime is one of the least mitigated murders this Court has reviewed. In fact, the record shows just the oppositei.e., that this is one of the most mitigated killings we have reviewed. Accordingly, Cooper's death sentence is disproportionate.
*358 Id. (footnotes omitted). While no two cases are exactly alike, we find the similarities between Cooper and this case compelling.[5]
As in Cooper, we find that the aggravating circumstances present here, though substantial, do not outweigh the combination of unrefuted and overwhelming mitigation that we have determined in other cases requires a life sentence: Crook's young age; his abusive childhood; his mental deficiencies, including organic brain damage; and his substance abuse problem, which aggravated his mental deficiencies. As in Cooper's case, the record reveals that Crook committed a murder that was accompanied by extreme mitigation, including evidence of frontal lobe brain damage, diminished control over his inhibitions, a disadvantaged home life, a substance abuse problem, and his age of twenty at the time of the murder.
We are particularly influenced by the unrefuted testimony of the mental health experts that relate the rage and brutal conduct in this crime to the defendant's brain damage and mental deficiencies. While there is no contention that these mental defects rise to the level of insanity so as to bar Crook's conviction for the murdernor do they rise to the level of mental retardation that would constitutionally limit his sentenceour case law has consistently held that these substantial mental deficiencies merit great consideration in evaluating a defendant's culpability in a proportionality assessment.
We conclude that this case falls squarely in the category of cases where we have reversed death sentences as being disproportionate in light of the overwhelming mitigation, especially the mental mitigation related to the circumstances of the crime. See, e.g., Hawk v. State, 718 So.2d 159, 163-64 (Fla.1998) (death disproportionate despite substantial aggravation, including contemporaneous attempted murder of separate victim, where mental mitigation was substantial); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997) (death disproportionate where HAC and other aggravation offset by age, impaired capacity, childhood abuse, and mental mitigation); Morgan v. State, 639 So.2d 6, 14 (Fla.1994) (death disproportionate despite HAC and other aggravation where copious mitigation included brain damage and youth). See also Larkins v. State, 739 So.2d 90, 95 (Fla.1999) ("The killing here appears to be similar to the killing that occurred in Livingston and to have resulted from impulsive actions of a man with a history of mental illness who was easily disturbed by outside forces."); Urbin, 714 So.2d at 417-18 (death disproportionate despite multiple aggravators, including prior violent felony, where mitigation included impaired capacity, deprived childhood, and youth); Knowles v. State, 632 So.2d 62, 67 (Fla. 1993) (death disproportionate despite contemporaneous *359 murder aggravator where substantial mitigation included brain damage and impaired capacity); Nibert v. State, 574 So.2d 1059, 1062-63 (Fla.1990) (death disproportionate where HAC aggravator offset by abused childhood, extreme mental and emotional disturbance, and impaired capacity due to alcohol abuse); Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988) (death disproportionate where aggravators, prior violent felony and murder committed during a robbery, offset by severe childhood abuse, youth and immaturity, and diminished intellectual functioning); Miller v. State, 373 So.2d 882, 886 (Fla.1979) (death disproportionate despite substantial aggravation, including HAC, where mental mitigation was substantial and related to crime).
Most persuasive in the mitigation evidence is the unrefuted testimony of Drs. McCraney, McClain, and McMahon directly tying Crook's impairments to his functioning at the time of the murderwhich clearly supports the trial court's attribution of "significant weight" to the statutory mitigators involving Crook's diminished mental capacity.[6] These circumstances, especially the testimony linking the combination of Crook's brain damage and substance abuse to his behavior at the time of the murder, counterbalance the effect of the aggravating factors. We also find it compelling that the unrefuted expert testimony indicated that Crook would be especially uninhibited when his already damaged brain was exposed to the negative effects of alcohol and drugs. As our cases demonstrate, the existence of this mitigation, and especially that evidence connecting the mental mitigation to the crime, prevents us from classifying this case as among the most aggravated and least mitigated.
Accordingly, we conclude that under our case law the death sentence is disproportionate here. Based on the foregoing, we vacate the death sentence and remand this case for the imposition of a life sentence without the possibility of parole on the first-degree murder conviction.[7] Of course, Crook's other convictions and sentences, including two other life sentences, remain intact, as they were affirmed in the previous appeal.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., dissents with an opinion.
WELLS, J., dissenting.
I dissent. I do not agree that the death sentence is disproportional to the death sentences in Lawrence v. State, 846 So.2d 440 (Fla.2003); Johnston v. State, 841 So.2d 349 (Fla.2002); Smithers v. State, 826 So.2d 916 (Fla.2002); and Pope v. State, 679 So.2d 710 (Fla.1996).
NOTES
[1] We have previously held that it was error for the State to argue to a jury that a life sentence without the possibility of parole could be construed as permitting release. Urbin v. State, 714 So.2d 411, 420 (Fla.1998).
[2] The social security evaluation included determinations that Crook was illiterate and totally disabled for employment purposes.
[3] Our opinion in the first direct appeal also explained that the trial court considered psychological evaluations conducted by Drs. Charles Haskovec and Roy Mercer:

Dr. Haskovec examined Crook when Crook was five years old and found that Crook had an IQ of 76, which according to Dr. Haskovec, placed Crook "within the Borderline range of functioning." Dr. Mercer examined Crook in 1995 when Crook was nineteen years old. According to Dr. Mercer's report, Crook had a full scale IQ of 75, which "plac[ed] his current level of overall intellectual functioning in the Borderline Range."
Crook, 813 So.2d at 72-73 n. 3.
[4] Crook has consistently maintained that he ingested alcohol and cocaine on the day of the murder. See Crook, 813 So.2d at 69-70. On the day of the murder, a witness saw Crook with a case of beer. Id. at 69. Further, according to the report of Mr. Rene del Sol, a mental health specialist who interviewed and evaluated Crook at the jail's request, Crook "had been drinking ..., sniffing paint thinner, and shooting heroin" on the day of the murder.
[5] The cases present remarkably similar circumstances. While Cooper had no criminal record, the trial court here found in mitigation that Crook lacked any history of violent criminal behavior. However, the evidence of mental health mitigation appears even stronger in Crook's case and was directly connected to the crime. The jury vote in Crook was an even closer seven-to-five, one vote away from a life recommendation. In addition, we note that the substantial mental health mitigation presented in Crook's case was essentially unrebutted, while the State presented substantial rebuttal evidence in Cooper. Further, while Cooper was slightly younger than Crook, the mental health evidence in Crook's case included expert testimony that his personality development was comparable to that of a three or four-year-old child. The aggravation in the two cases, while different, is also comparable: both involved three aggravators, the most serious in Cooper being another murder, and the most serious here being HAC.
[6] The statutory mitigators involving Crook's diminished mental capacity are: (1) murder committed while the defendant was under the influence of extreme or emotional disturbance and (2) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
[7] In light of the reversal and remand of this case for an imposition of a life sentence, we do not reach Crook's claim that the Florida death penalty statutory law and procedure are unconstitutional.