*1277
 
 PER CURIAM.
 

 Charles Grover Brant was convicted of first-degree murder, sexual battery, kidnapping, grand theft of a motor vehicle, and burglary with assault or battery arising from the 2004 strangulation of Sara Radfar. Brant was sentenced to death. This case is before the Court on appeal from the convictions and death sentence. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences.
 

 I. BACKGROUND
 

 On May 25, 2007, Brant pleaded guilty to first-degree murder, sexual battery, kidnapping, grand theft of a motor vehicle, and burglary with assault or battery. The prosecutor recited a lengthy factual basis for the pleas, establishing that Brant sexually battered and strangled Radfar in her home on July 1, 2004. The trial court found that there was a sufficient factual basis for the pleas and that the pleas were knowingly, intelligently, and voluntarily entered. On August 13, 2007, the trial court adjudicated Brant guilty.
 

 On August 22, 2007, Brant waived his right to a penalty-phase jury. Accordingly, a penalty-phase proceeding was conducted before the trial court on August 22-24, 2007. Both the State and the defense presented evidence. The evidence established the following.
 

 On July 2, 2004, law enforcement officers found Radfar dead in her home. A rear window of her duplex was open, and the front door was locked from the inside. Radfar was in her bathtub with water running over her. Jacqueline Lee, M.D., Associate Medical Examiner for the Hills-borough County Medical Examiner’s Department, testified that while performing the autopsy, she found a plastic bag over the victim’s head, and she also found a dog leash, an electrical cord from a heating pad, and a woman’s stocking around the victim’s neck. Dr. Lee stated that bruises on the victim’s body could be interpreted as defensive wounds and that hemorrhages involving the eyes and eyelids were indicative of strangulation. She testified that the cause of death was strangulation and suffocation.
 

 Deputy Rodney Riddle of the Hillsbor-ough County Sheriffs Office and Kathy Frank Smith, previously a homicide detective for the Hillsborough County Sheriffs Office, testified that on July 2, 2004, they each spoke with Brant, who lived near Radfar, as part of neighborhood surveys. Brant told the officers that on the night of the homicide, he saw a man with long hair in a white button-down shirt with the victim and that the next day he saw a man in a yellow raincoat and black pants running behind his residence. Deputy Riddle testified that during their conversation, Brant was calm, cordial, and coherent and did not appear to be under the influence of drugs or alcohol. Smith likewise testified that during their conversation, Brant was coherent and that she did not notice any signs of the influence of drugs or alcohol. One of Brant’s neighbors, who spoke briefly with Brant around 5 p.m. on July 2, 2004, similarly testified that Brant did not appear to be under the influence of drugs or alcohol during their conversation.
 

 Detective Smith also testified that as part of the homicide investigation, law enforcement officers collected garbage from Brant’s porch and from a garbage can by Brant’s mailbox. The officers retrieved, among other items, a debit card with the victim’s name and photograph on it, a man’s white cotton shirt, a yellow raincoat, a pair of black pants, a mass of long, brown hair, four latex gloves, and a box that had contained women’s stockings.
 
 *1278
 
 Smith stated that Brant had short, dark hair when he spoke with her.
 

 Detective Frank Losat of the Hillsbor-ough County Sheriffs Office testified that he interviewed Brant during the early morning hours on July 4, 2004. Detective Losat stated that Brant was cooperative and spoke willingly. Detective Losat testified that at first, Brant repeated the story he had told Officers Riddle and Smith about a person running through his backyard wearing a raincoat. After being informed that law enforcement officers had discovered items in his trash belonging to the victim, Brant changed his story, admitting his involvement in the homicide.
 

 Detective Losat testified that Brant explained that he went to Radfar’s home on July 1, 2004, to take pictures of her tile floor, which he had installed, for his portfolio. Radfar let him in, and while he was taking photographs of the tile, Radfar walked into the bathroom. Brant grabbed Radfar, dragged her into one of the bedrooms, and sexually assaulted her. Brant stated that he put a sock in Radfar’s mouth to quiet her and then started to choke and suffocate her. He explained that when he thought Radfar had either lost consciousness or died, he started walking around in the house. When she regained consciousness and ran to the front door, Brant dragged her back into the bedroom. At that point, Brant again began to choke and suffocate her. He stated that the choking and suffocation went on for some time. Brant next took Radfar to the bathroom. He said that she was hic-cupping and breathing a little bit as he put her in the tub. Brant then grabbed a stocking, a dog leash, and an electrical cord from a heating pad, and wrapped those items around Radfar’s neck. Brant told the officers that Radfar died while in the tub. He also stated that after her death, he started to clean up the duplex, changed into clothing he found in the home, left through the front door, moved Radfar’s car, and walked home. Brant further explained that on the next day, he went back into Radfar’s residence and tried to wipe down any fingerprints that he may have left. Brant stated that he was going to leave through the front door when he observed a deputy approaching the door. He then turned the deadbolt on the door, fled through a rear window, and jumped the privacy fence to go back to his house.
 

 Detective Losat testified that during the interview, he did not detect any evidence that Brant was under the influence of drugs, alcohol, or medication. Brant was coherent. Christi Esquinaldo, a corporal for the Hillsborough County Sheriff’s Office, testified that she was present during Detective Losat’s July 4, 2004, interview with Brant. She stated that she did not observe any evidence that Brant was intoxicated at that time.
 

 In addition to hearing testimony from Detective Losat and Corporal Esquinaldo, the trial court accepted into evidence a transcript of the July 4, 2004, interview. The trial court also accepted a stipulation from the parties regarding DNA evidence collected during the homicide investigation. The stipulation provided that “analysis of Sara Radfar’s vaginal swab taken from the rape kit’at the Medical Examiner’s Office demonstrated the presence of semen. The DNA analysis of the semen revealed that it matched the defendant’s DNA. In other words, Charles Brant was the source of the semen.”
 

 The State also called Melissa Ann McKinney, Brant’s former wife, who testified that she and Brant were married from June 1991 until December 2004 and that they have two sons together. McKinney explained that she and Brant met in 1990 when they were students at a Bible college
 
 *1279
 
 in Virginia but left the school voluntarily before either graduated. McKinney testified that at the time of Brant’s arrest, Brant did not have a full-time job but did renovation and maintenance work for their landlord. McKinney confirmed that Brant installed tile in the duplex occupied by Radfar and that in July 2004, he began compiling a portfolio in an effort to get more tile work.
 

 McKinney explained that she and Brant separated eight or nine times during their thirteen-year marriage due to Brant’s drug use. Brant used marijuana continuously and began using ecstasy around 1999. McKinney testified that Brant began using methamphetamine about six months before the murder. He obtained a package of it “like every week.” McKinney explained that while using methamphetamine, Brant would stay up for four or five nights in a row without sleep and then crash. During the first few days of a cycle, he would be very productive and “cheerful ... in a better mood but he was always fidgety.” When Brant would start coming off the drug, he would not finish tasks because he was looking for more drugs. By day four or five, he was “[i]rri-table, snappy.” McKinney explained that during the six months Brant was using methamphetamine, “he became a different person” and “it seemed like he didn’t care anymore. He didn’t — all he wanted was that drug, and he didn’t care if he finished jobs. He didn’t care about his family. I mean, he just he became obsessed with sex.” Beginning about two weeks before the murder, McKinney noticed Brant talking to himself while he worked.
 

 McKinney also testified that in approximately 2000, Brant asked her to participate in sex games involving force. About two years before the murder, the games became rougher, and because she was afraid she would be hurt, McKinney began to object. Brant would surprise McKinney by hiding in the house, wearing a mask and latex gloves, and grabbing her from behind. McKinney stated that she believed Brant sometimes would even hide his car to give the impression that he was not at home in order to surprise her more effectively. She explained that during that two-year period, they had intercourse almost daily and that Brant “would get violent” and “do the scaring” every couple of weeks.
 

 McKinney testified that Brant became sneakier and more violent when he began using methamphetamine. For example, on Wednesday, June 30, 2004, the night before the murder, Brant hid in a closet and attacked McKinney when she came into the room. He put her on her stomach on the bed, bound her hands, and attempted to put a sock in her mouth. McKinney explained that she was able to get away from Brant and stayed in the bathroom that night. McKinney stated that she believed Brant was on methamphetamine when he attacked her. He had started staying up on Sunday of that week and had “been up for quite a few days.” McKinney further explained that on the morning of Thursday, July 1, 2004, she threatened to go to the police if the games did not stop.
 

 McKinney further testified that on Thursday, Brant was at home when she returned from work at around 6 or 6:30 p.m. McKinney took their sons to see a movie that evening. Brant was invited to attend, but he declined. McKinney stated that they returned home at around 11 p.m. Brant was in the kitchen washing dishes. He was acting nice, which surprised McKinney because they had been angry with each other for a few days. McKinney testified that Brant seemed to be under the influence of drugs when she returned — he was “speedy” and “fidgeting.”
 
 *1280
 
 Brant asked McKinney to cut his hair, which she did. McKinney testified that Brant slept in the bed with her that night, but they did not have sex. McKinney testified that she next saw Brant between 6 and 7 p.m. on Friday. Brant was writing a statement for the police. McKinney testified ■ that he appeared to be under the influence of drugs at that time. She said that “[h]e was acting nervous. He was just acting all over the place, like he was on the drug.”
 

 The defense called several lay witnesses and two mental health experts to establish mitigating circumstances.
 

 Crystal Florence Coleman, Brant’s mother, testified that their family had a history of depression and other mental health conditions. She also testified about Brant’s childhood. She stated that once Brant could walk, “he started beating his head against the floor” and “pounding holes in the walls.” She stated that Brant ate plaster and fertilizer as a child. When Brant was around five, Crystal married Marvin Coleman. Crystal testified that Marvin, who drank heavily, would spank or whip Brant over trivial matters until he bled, would threaten Brant, and “was very derogatory toward” Brant.
 

 Sherry Lee Brant-Coleman, Brant’s older sister, similarly testified that Brant’s stepfather was an alcoholic and “a bully” to Brant. Sherry testified that Marvin singled Brant out from the other children for more criticism and physical abuse. Sherry also testified about Brant’s behavior shortly after the murder. She saw Brant at- their mother’s Orlando home in early July 2004. She was informed that Brant had told their half-brother, Garrett Coleman, that he was involved in what happened to Radfar and “that he was hallucinating and he had — was going to turn himself in.” Sherry explained that she and several family members and friends went with Brant to a police substation, which was closed because it was a holiday weekend. They then drove to another station. Brant and Garrett went into the station but returned twenty minutes later. They claimed that the law enforcement officers told them there was no information at that station about the Radfar homicide and that Brant would have to go to a Tampa area station.
 

 Two witnesses, Reverend John Hess, III, a minister affiliated with Blue Ridge Bible College in Rocky Mount, Virginia, and Pastor Leon Wendall Jackson, of the Faith Family Worship Center Assembly of God Church in Citrus Park, testified that Brant had spoken to them about having a drug use problem. Reverend Hess testified that Brant was a student at the Bible college,, then known by a different name, for one semester in 1990. Reverend Hess explained that in approximately 1997, Brant contacted Hess about reapplying to the school, stating that he had gotten rein-volved in drugs and was looking to straighten out his life. Hess assured Brant that he could reapply, but Brant did not pursue the option. Pastor Jackson met with Brant and McKinney in 2003 when they were having marital troubles and Brant was having problems with drugs, particularly cocaine. Pastor Jackson counseled Brant about his drug problem and looked into placing Brant in an eighteen-month treatment program. Brant declined to enter treatment because he did not think that he could afford to not work.
 

 Other witnesses testified that they had known Brant to be a nonviolent person, a good father to his children, and a good craftsman. Still other witnesses testified about the grief and remorse that Brant had expressed since being incarcerated.
 

 Defense expert witness Michael Scott Maher, M.D., a physician and psychiatrist,
 
 *1281
 
 diagnosed Brant as suffering from severe methamphetamine dependence associated with psychotic episodes, sexual obsessive disorder, and chronic depression. Dr. Maher described Brant as a lifestyle user of methamphetamine and explained that lifestyle users begin using methamphetamine to support working long hours but that the use “almost inevitably results in a dependency and a deterioration,” ultimately leading to psychosis. Dr. Maher opined that Brant’s dependency had reached the point of causing psychosis:
 

 I’m not suggesting that he was legally insane; but I am certainly suggesting that he had — I’m offering the opinion that he had periods of psychosis associated with his methamphetamine use and that those periods were a significant part of his experience at and around the time of the offense.
 

 Dr. Maher explained that during a period of methamphetamine-induced psychosis, Brant would be highly energized, would have a pattern of irritability and behavioral fidgetiness, and would hear, see, or feel things that he was not entirely sure were real. Dr. Maher identified poor impulse control as “a substantial hallmark of methamphetamine abuse.” Dr. Maher further explained that because Brant’s “purpose and motivation for using the drugs was to work and ultimately to promote and participate in his idea of being a good husband and a good father and a good worker,” Brant would have been “making a very substantial effort to use the mental functioning that he still had in a way to appear normal.” Dr. Maher testified that after his arrest, Brant was given “antipsychotic medications and some other medications to help him calm down.”
 

 Dr. Maher concluded that Brant suffered from sexual obsessive disorder based on descriptions of the “psychological force of those sexual urges” provided by Brant and McKinney. Dr. Maher stated that Brant’s “pattern of sexual behavior with his wife which predated this incident and ... his severe use of methamphetamines ... are consistent with an obsessive pattern of sexual interest.” Dr. Maher explained that the sex games between Brant and his wife had “a general effect of creating lower inhibitions to this kind of link between surprise, violence and sex” and that these lowered inhibitions were “clinically significant in understanding” Brant’s behavior at the time of the sexual battery and murder.
 

 Dr. Maher further testified that Brant had a history of depression and relationship problems going back into childhood. Dr. Maher opined that Brant’s relationships with his mother, grandmother, stepfather, and wife all showed significant patterns of pathology. Dr. Maher testified that Brant began to use marijuana and alcohol as an adolescent to self-medicate and “escape from his chronically depressed and anxious state of mind.”
 

 Finally, Dr. Maher testified that Brant might suffer from abnormal brain functioning. Dr. Maher explained that the twenty-five point difference between Brant’s verbal and performance IQs was indicative of abnormal brain functioning. He also stated that a PET scan of Brant’s brain showed four areas of suppressed glucose uptake that could indicate underactivity in those parts of the brain. Dr. Maher identified those portions of the brain as being important to impulse control and good judgment. Dr. Maher stated that while Brant previously was diagnosed with attention deficit disorder, he did not think a diagnosis of adult attention deficit disorder was warranted.
 

 Based on the foregoing, Dr. Maher opined that Brant, while legally sane at the time of the sexual battery and murder, “had, as a result of mental disease, defect,
 
 *1282
 
 a substantial impairment and limitation in his ability to conform his behavior to the requirements of the law.”
 

 Another defense witness, Dr. Valerie R. McClain, a psychologist, testified as an expert in forensic neuropsychology. Dr. McClain diagnosed Brant with polysub-stance dependence, major depression recurrent, and cognitive disorder not otherwise specified. Dr. McClain explained that Brant’s overall intellectual functioning was in the “low average” range. She testified that school records documented signs of a learning disorder and that Brant’s language skills were in the sixteenth percentile compared to other students and his non-language skills were in the sixth percentile. She explained that Brant had problems in the areas of learning, memory, and executive planning or organizational skills. Psychological testing showed signs of depression, pessimism, suicidal ideation, preoccupation with health problems, problems with poor judgment, passive, dependent style in relationships, and problems with insecurity, inadequacy, and a sense of inferiority. The testing also indicated that Brant was quick-tempered and may have had “some tendency to magnify or exaggerate his current difficulties.” Dr. McClain further testified that at the time of then.' interview in October 2005, Brant was being prescribed Benadryl, Haldol, Pambalor, and Wellbutrin.
 

 Dr. McClain testified that Brant stated that before the sexual battery and murder, he had consumed alcohol and had been “doing significant amounts” of crystal methamphetamine for approximately eight days and ecstasy for two days. Brant also told Dr. McClain that he had not been sleeping well before the murder. Dr. McClain explained that in people such as Brant, who already have underlying anger problems, methamphetamine use is going to make them more likely to be “[ijmpul-sive or to not be able to control their anger.” Dr. McClain opined that due to Brant’s deficits in brain functioning, Brant’s capacity to conform his conduct to the requirements of law was substantially impaired on July 1, 2004.
 

 After the defense rested, the State presented a witness to rebut witness McKinney’s claim that she and Brant left college voluntarily. The State’s witness established that Brant and McKinney may have been asked to leave the school for violating the school’s policy against sexual activity among students. The State also presented a mental health expert and victim impact statements.
 

 Specifically, Donald R. Taylor, Jr., M.D., an expert in forensic psychiatry, testified that in July 2004, Brant suffered from substance dependence disorder (primarily involving alcohol, cannabis, ecstasy, and methamphetamine), a learning disorder, and sexual sadism. Aside from rough sex with McKinney, Dr. Taylor was not aware of Brant acting violently prior to July 1, 2004. Dr. Taylor testified that during the first several days or weeks after arrest, Brant experienced symptoms of alcohol and drug withdrawal and that during the first several weeks or months, Brant experienced symptoms of anxiety or depression. Dr. Taylor stated that Brant was treated with psychotropic medications beginning after his arrest in July 2004 until May 2007. Dr. Taylor defined sexual sadism as a “type of sexual disorder in which somebody derives sexual arousal or pleasure from causing physical humiliation or suffering to a person that is not consenting to the sexual act.” Dr. Taylor explained that in most cases, sexual sadism arises out of a genetic predisposition and unhealthy childhood environment. Dr. Taylor testified that Brant’s childhood contained factors that can contribute to a diagnosis of sexual sadism.
 

 
 *1283
 
 Concerning the sexual battery, Dr. Taylor opined that Brant did have “a substantial impairment in his ability to conform his conduct with the requirements of the law” due to his sexual sadism and the influence of methamphetamine. Dr. Taylor explained that due to a sexual disorder, Brant had sexual impulses that were difficult for him to control and that this difficulty would have been exacerbated by the use of methamphetamine. With regard to the murder, in contrast, Dr. Taylor opined that Brant was not “substantially” impaired. He explained that there was no “similar disorder that was causing [Brant] any type of uncontrollable or difficult to control urges to kill.” Moreover, Dr. Taylor stated that Brant’s actions of preventing the victim from leaving the duplex, putting on gloves, putting the body in the tub and turning on the water, and changing clothes before leaving were not consistent with substantial impairment. Still, Dr. Taylor testified that there was “some level of impairment related to being under the influence of methamphetamines” during the murder. Dr. Taylor summarized that Brant “did have a mental disorder, which in my opinion substantially impaired his ability to refrain from committing rape but that he did not have any similar corresponding mental disorder which caused a similar type of impairment in his able [sic] to refrain from committing murder.”
 

 After conducting a hearing pursuant to Spencer n
 
 State,
 
 615 So.2d 688 (Fla.1993), during which McKinney testified and statements from Garrett Coleman were introduced into evidence, the trial court sentenced Brant to death for the murder, concurrent sentences of life in prison for the sexual battery, kidnapping, and burglary convictions, and a sentence of five years’ imprisonment for the grand theft conviction. The trial court found two aggravating circumstances applicable to the murder: (1) the murder was heinous, atrocious, or cruel (HAC); and (2) the capital felony was committed while engaged in the commission of a sexual battery. Each aggravating factor was given great weight. The trial court found three of the mitigating factors specifically enumerated in section 921.141(6), Florida Statutes (2007):(1) Brant had no significant history of prior criminal activity, given little weight; (2) Brant’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, given moderate weight; and (3) Brant was thirty-nine years old at time of the offense, given little weight. The trial court also found numerous nonstatutory mitigating factors: (1) Brant is remorseful (little weight); (2) he cooperated with law enforcement officers, admitted the crimes, pleaded guilty, and waived a penalty-phase jury (moderate weight); (3) he has borderline verbal intelligence (little weight); (4) he has a family history of mental illness (little weight); (5) he is not a sociopath or psychopath and does not have antisocial personality disorder (little weight); (6) he has diminished impulse control and exhibits periods of psychosis due to methamphetamine abuse, recognized his drug dependence problem, sought help for his drug problem, and used methamphetamine before, during, and after the murder (moderate weight); (7) he has been diagnosed with chemical dependence and sexual obsessive disorder, and he has symptoms of attention deficit disorder (moderate weight); (8) he is a good father (little weight); (9) he is a good worker and craftsman (little weight); and (10) he has a reputation of being a nonviolent person (little weight).
 

 II. ANALYSIS
 

 On appeal, Brant argues that his death sentence is disproportionate. He does not
 
 *1284
 
 raise any claims regarding the propriety of his pleas or his penalty-phase trial. After addressing Brant’s proportionality argument, we review the sufficiency of Brant’s guilty plea to the offense of first-degree murder.
 

 A. Proportionality
 

 To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of circumstances and compares each case with other capital cases. The Court does not simply compare the number of aggravating and mitigating circumstances.
 
 Taylor v. State,
 
 937 So.2d 590, 601 (Fla.2006);
 
 see also Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990) (“Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.” (citation omitted)). Having reviewed the record and other factually similar capital cases, we conclude that Brant’s death sentence is proportionate.
 

 In this case, the trial court found two aggravating circumstances applicable to Radfar’s murder — HAC and that the murder was committed while engaged in the commission of a sexual battery — each given great weight. The defense conceded that these factors were applicable to the murder, and both factors are supported by the record. As stated above, the trial court also found three statutory mitigating factors and ten nonstatutory mitigating factors. Brant argues that the mitigation in his case outweighs the aggravation. Specifically, he contends that because his mental illness and drug addiction were causally related to his attack on the victim, his responsibility for his violent actions is substantially diminished and his death sentence is disproportionate.
 

 Brant cites numerous cases to support his claim that his death sentence is disproportionate. Brant’s argument is best supported by this Court’s decision in
 
 Crook v. State,
 
 908 So.2d 350 (Fla.2005). Crook sexually battered and fatally stabbed a bar owner during a robbery. Crook had consumed beer, crack cocaine, and marijuana laced with heroin before the murder. On resentencing, the trial court found three aggravating factors: commission during a sexual battery; pecuniary gain; and HAC. The trial court also found statutory mitigation: age of twenty at the time of the offense, which was supported by expert testimony that Crook had the personality development of a three- or four-year-old; the influence of extreme mental or emotional disturbance; and substantially impaired capacity. In addition, the trial court found nonstatutory mitigating circumstances including brain damage, borderline intelligence, and an abusive childhood.
 
 Id.
 
 at 355-56. On appeal, this Court held the death sentence disproportionate, explaining:
 

 Most persuasive in the mitigation evidence is the unrefuted testimony of Drs. McCraney, McClain, and McMahon directly tying Crook’s impairments to his functioning at the time of the murder— which clearly supports the trial court’s attribution of “significant weight” to the statutory mitigators involving Crook’s diminished mental capacity. These circumstances, especially the testimony linking the combination of Crook’s brain damage and substance abuse to his behavior at the time of the murder, counterbalance the effect of the aggravating factors. We also find it compelling that the unrefuted expert testimony indicated that Crook would be especially uninhibited when his already damaged brain was exposed to the negative effects of
 
 *1285
 
 alcohol and drags. As our cases demonstrate, the existence of this mitigation, and especially that evidence connecting the mental mitigation to the crime, prevents us from classifying this case as among the most aggravated and least mitigated.
 

 Id.
 
 at 359 (footnote omitted).
 

 The mitigation in Brant’s case is similar in some respects. All three mental health experts, including the mental health expert called by the State, agreed that Brant had a substance abuse problem and that his methamphetamine use aggravated his preexisting difficulties with impulse control. All agreed that the combination of Brant’s mental makeup, his childhood abuse, and his drug use substantially impaired his capacity to conform his conduct at the time of the sexual battery, and the experts called by the defense opined that Brant’s capacity to control his conduct at the time of the murder was substantially impaired. However,' the mitigation in Brant’s case is materially distinguishable from that in Crook’s case. The trial court in Brant’s case did not find the mitigating evidence to carry “significant weight” as the trial court did in
 
 Crook.
 
 While there was evidence that Brant suffered from a learning disorder and had borderline language skills, there was no evidence of borderline mental retardation, stunted personality development, and increased sensitivity to intoxication as in
 
 Crook.
 
 An additional distinguishing factor is that Brant was thirty-nine years old at the time of the offense, while Crook was merely twenty years old.
 

 Brant also relies on
 
 Cooper v. State,
 
 739 So.2d 82 (Fla.1999), in which this Court held that the death sentence was disproportionate. Cooper killed a pawnshop owner during a robbery. The trial court found three aggravating factors: prior violent felony, based on another robbery-murder committed several days after the charged offense; commission during a robbery/pecuniary gain; and cold, calculated, and premeditated. In mitigation, the trial court found the no significant history of prior criminal activity and age (Cooper was eighteen) statutory factors and non-statutory mental health mitigation based on Cooper’s brain damage, borderline-mental retardation, paranoid schizophrenia, and abusive childhood. Despite the substantial aggravation in
 
 Cooper,
 
 this Court held that the death sentence was disproportionate because the crime was not one of the least mitigated murders.
 
 Id.
 
 at 86. While Brant likewise had no significant history of prior criminal activity, an abusive childhood, and some impaired intellectual functioning, the degree of mental health mitigation in Brant is not as compelling as that in
 
 Cooper.
 
 There was no evidence that Brant suffered from borderline mental retardation or schizophrenia. And again, we consider it significant that despite his drug dependence, depression, and other mental or emotional impairments, Brant functioned in society for thirty-nine years prior to his offense. Cooper was eighteen when he committed murder.
 

 The remaining precedents cited by Brant are likewise distinguishable because they are more mitigated, less aggravated, or simply too factually dissimilar to Brant’s case.
 
 See, e.g., Morgan v. State,
 
 639 So.2d 6 (Fla.1994) (holding death sentence disproportionate despite HAC and commission during a felony aggravating factors where defendant was sixteen years old and had a history of substance abuse problems);
 
 Kramer v. State,
 
 619 So.2d 274, 278 (Fla.1993) (holding death sentence disproportionate where the “evidence in its worst light suggests nothing more than a spontaneous fight ... between a disturbed alcoholic and a man who was legally
 
 *1286
 
 drunk”);
 
 Nibert v. State,
 
 574 So.2d 1059 (Fla.1990) (holding death sentence disproportionate where HAC was sole aggravating factor and trial court should have found both mental health mitigating factors and given more weight to the mitigating circumstance of Nibert’s childhood).
 

 Considering the totality of the circumstances, we conclude that Brant’s case is more similar to cases in which this Court has held that the death sentence is proportionate. We consider Brant’s case particularly analogous to
 
 Orme v. State,
 
 677 So.2d 258 (Fla.1996). Orme had a history of substance abuse. One morning, Orme appeared at a recovery center where he had previously sought treatment. He tested positive for cocaine, appeared disoriented, was unable to respond to questions, and displayed symptoms of acute cocaine withdrawal. Orme wrote the message: “LEE’S MOT RM15.” Shortly thereafter, Lisa Redd was found beaten and strangled to death in room fifteen of Lee’s Motel. Orme explained that he summoned his friend Redd, who was a nurse, to the motel room because he was experiencing a bad high but did not admit to killing her. The trial court found three aggravating factors: capital felony committed in the course of a sexual battery; capital felony committed for pecuniary gain; and HAC. The trial court also found both mental health statutory mitigating factors.
 
 Id.
 
 at 260-61.
 

 Orme argued that his death sentence was disproportionate because his will was overborne by the effects of his drug abuse. This Court rejected the argument, explaining that “the State submitted competent substantial evidence that, despite his addiction, Orme was able to hold down a job and hide his drug abuse from his family” and that “[o]n the night of the murder he was able to drive a car without incident and talked in a normal manner with persons he encountered.”
 
 Id.
 
 at 263. This Court also rejected Orme’s argument that the murder arose from a “lover’s quarrel,” instead concluding that the killing was “designed to further both a sexual assault and a robbery.”
 
 Id.
 

 Here too we reject the contention that Brant’s will was so overborne by his drug abuse as to render the death penalty disproportionate. Like Orme, Brant was able to arrange to be alone with his victim and drove a car immediately after the murder despite his drug use. According to McKinney, Brant’s ex-wife, Brant appeared to be under the influence of methamphetamine on the evening of the murder but he nevertheless was able to interact pleasantly with her, wash dishes and clean up the kitchen, watch the evening news, and sleep in bed next to her. Two law enforcement officers and a neighbor testified that Brant did not appear to be intoxicated the day after the murder, and McKinney testified that Brant was able to And work doing home maintenance and repairs during the week of the murder. In addition, although the three mental health experts agreed that Brant’s behavior on the night of the murder was affected by his methamphetamine use and two experts discussed the effect of Brant’s sexual urges on his behavior, none opined that the extreme mental or emotional disturbance mitigating factor was applicable to Brant’s case. Overall, the balance of aggravation and mitigation in Brant’s case is qualitatively similar to that in
 
 Orine.
 

 The balance of aggravation and mitigation is also similar in
 
 Rogers v. State,
 
 783 So.2d 980 (Fla.2001). Rogers and the victim left a bar together. The victim was found stabbed to death in a motel room. The trial court found two aggravating circumstances, pecuniary gain and HAC; the statutory mitigating circumstance of substantially impaired capacity; and several
 
 *1287
 
 nonstatutory mitigating circumstances such as alcohol consumption before the crime and a difficult childhood. Testimony by mental health experts established that Rogers suffered from brain damage and mental illness, including a rare genetic mental disease called porphyria, which may cause psychosis and strokes. Psychological testing indicated that Rogers suffered from schizophrenia, mania, and paranoia.
 
 Id.
 
 at 995. The trial court found that Rogers’ mental illness “which may be exacerbated by alcohol” substantially impaired his capacity to conform his conduct to the requirements of law at the time of the murder.
 
 Id.
 
 at 996. Despite this evidence of substantial mental impairment, this Court held that Rogers’ death sentence was proportionate. Here too, we conclude that Brant’s impairment due to abnormal brain functioning and drug use, while mitigating, is not so mitigating as to make his death sentence disproportionate.
 

 Next, Brant’s case is factually similar to
 
 Blackwood v. State,
 
 777 So.2d 399 (Fla.2000). Blackwood and the victim dated on and off for approximately ten years. The relationship ended in October 1994. In January 1995, Blackwood went to the victim’s home. Blackwood and the victim engaged in consensual sexual intercourse but then began to argue. The victim was found with a washcloth and bar of soap lodged in the back of her mouth. Markings on her neck indicated both ligature and manual strangulation, and the evidence suggested that there had been a struggle in the room. A mental health expert testified that Black-wood was emotionally disturbed at the time of the offense but declined to categorize the disturbance as “extreme.”
 
 Id.
 
 at 405. The trial court found the aggravating factor of HAC, the statutory mitigating factor of no significant history of prior criminal conduct, and numerous nonstatutory mitigating factors, including emotional disturbance at the time of the crime. In reviewing proportionality, this Court explained:
 

 The record here shows that the appellant manually strangled the victim, strangled her with wire, lodged a bar of soap and washcloth in the back of her throat, and smothered her with a pillow. Extensive petechia hemorrhaging in the victim’s eyes indicates that the appellant applied pressure to her neck, released it, and then reapplied it. There is also evidence that the victim struggled for her life during this attack.... In light of this evidence, we cannot conclude that the trial court abused its discretion in determining that the HAC aggravator outweighed the mitigators. Thus, we uphold the imposition of the death sentence in this case.
 

 Id.
 
 at 413.
 

 The showing of mitigation in Brant’s case is arguably more compelling than that presented in
 
 Blackwood.
 
 While both defendants were in their late thirties and had never committed a violent crime prior to the murders, the cases differ in that the trial court found that Brant had a substantially impaired capacity to conform his conduct to the requirements of law, diminished impulse control, and periods of psychosis due to methamphetamine abuse. The
 
 Blackwood
 
 trial court did not find any statutory mental health mitigation. Despite the additional mitigation in Brant’s case, the cases are nevertheless comparable for purposes of proportionality review because Brant’s case is also more heavily aggravated. Both murders were drawn-out processes during which the defendant used several items to eventually effectuate death. Brant admitted that the victim regained consciousness after he once choked her and that he then strangled and suffocated her more. But in the instant case, there is an additional aggravating factor—
 
 *1288
 
 unlike in
 
 Blackwood,
 
 the murder was committed during the course of a sexual battery.
 

 Finally, Brant’s case is similar to
 
 Spencer v. State,
 
 691 So.2d 1062 (Fla.1996). Spencer beat and stabbed his wife after having previously attacked her on several occasions. The trial court found two aggravating factors: prior violent felony (based on contemporaneous convictions for aggravated assault, aggravated battery, and attempted second-degree murder) and HAC. The trial court found both statutory mental health mitigating factors — the murder was committed while Spencer was under the influence of extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired — and numerous nonstatutory mitigating factors, including drug and alcohol abuse and paranoid personality disorder.
 
 Id.
 
 at 1063. The trial court gave “some weight” to the statutory mitigating factors but did not assign them great weight due to “Spencer’s ability to function in his job and his capacity to plan and carry out his wife’s murder.”
 
 Id.
 
 at 1064-65. On appeal, this Court concluded that Spencer’s death sentence was proportionate despite the statutory mental health mitigation. As in
 
 Spencer,
 
 the record demonstrates that Brant was able to function in most aspects of his life despite his drug dependence and his sexual obsessive disorder.
 

 Based on the cumulative pattern of the cases discussed above, we conclude that Brant’s death sentence is proportionate. While there is substantial mitigation in Brant’s case, there is also weighty aggravation — HAC and that the murder was committed during the commission of a sexual battery. The trial court did not err in imposing the death sentence.
 

 B. Sufficiency of Plea
 

 Brant does not challenge the sufficiency of the evidence of his guilt or the validity of his guilty plea. However, in all direct appeals where the death penalty has been imposed, this Court reviews the record to determine whether the evidence is sufficient to support the murder conviction. Fla. R.App. P. 9.142(a)(6);
 
 see also Winkles v. State,
 
 894 So.2d 842, 847 (Fla. 2005) (citing Fla. R.App. P. 9.140(f)). In
 
 Winkles,
 
 this Court explained:
 

 “[W]hen a defendant has pled guilty to the charges resulting in a penalty of death, this Court’s review shifts to the knowing, intelligent, and voluntary nature of that plea.”
 
 Lynch v. State,
 
 841 So.2d 362, 375 (Fla.2003);
 
 see Koenig v. State,
 
 597 So.2d 256, 257 n. 2 (Fla.1992) (stating that where a death-sentenced defendant pled guilty, “[i]n order to review the judgment of conviction ..., we must review the propriety of [the defendant’s] plea, since it is the plea which formed the basis for his conviction”). “Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.”
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002).
 

 894 So.2d at 847. The record in this case contains competent, substantial evidence showing that Brant’s plea was knowingly, intelligently, and voluntarily made.
 

 The trial court conducted an extensive colloquy in which the trial court explained each count and the possible sentences to Brant. The trial court repeatedly informed Brant that his pleas were “open guilty pleas which means that ... there is no agreement or understanding between you and the State as to what sentence I will impose when you come back for sentencing.” The trial court explained to
 
 *1289
 
 Brant his constitutional right to be tried by a jury, his right to call and confront witnesses, and, if convicted, his right to present mitigating evidence and receive an advisory sentence from a jury. Brant answered that he understood the consequences of his pleas and the rights he was waiving. The trial court also informed Brant that the pleas could subject Brant to involuntary commitment as a sexually violent predator and that by entering guilty pleas, Brant would waive all appellate issues except the expressly reserved issue of the trial court’s denial of Brant’s motion to dismiss the kidnapping count. Again, Brant answered that he understood.
 

 After the factual basis for the pleas was established, the trial court inquired whether Brant was satisfied with the advice, investigation, and representation provided by defense counsel. When asked if there was anything Brant thought counsel should do, he answered, “No sir. They have done everything.” Finally, the trial court inquired about Brant’s health and education. Brant answered that he had taken Wellbutrin for depression at 3 a.m. that morning. When asked if the medication affected his ability to communicate and understand anything discussed that day, Brant answered that it did not, and his counsel confirmed that they were able to adequately communicate with Brant that morning. When asked about his ability to read the plea form, Brant stated that he dropped out a “month until [high school] graduation” and assured the court that he could read and write.
 

 Based on the thorough discussion between the trial court, Brant, and Brant’s counsel, we conclude that Brant knowingly, intelligently, and voluntarily entered his plea to first-degree murder, and the trial court properly accepted it.
 

 III. CONCLUSION
 

 Based on the foregoing, we affirm Brant’s conviction for first-degree murder and his sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.