Filed 7/31/14  P. v. Gotell CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064206 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD234113) |
| JOSEPH GOTELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter Deddeh, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph Gotell appeals from a judgment convicting him of first degree murder with an enhancement for personal discharge of a firearm.  He argues (1) the court erred in

finding him competent to stand trial, and (2) his sentence of 50 years to life is unconstitutional cruel and unusual punishment. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of May 14, 2011, defendant (age 83) fatally shot his wife, Deborah Meeks (age 57), while she was walking with him near the downtown San Diego residence where she was staying.

Jael Barry, Meeks's adult daughter, testified that after Meeks and defendant started dating in 2004 or 2005, she did not see much of her mother because defendant did not want her family around, and defendant and her mother would fight when her mother got together with her family. On occasions when Barry saw her mother was not happy with defendant, Barry tried to help her mother leave him by finding a place for her to live. On one of these occasions, defendant left Barry a voice mail threatening to kill Meeks if she did not return to him.

Meeks's mother, who was ill, lived in a single room occupancy hotel in downtown San Diego, and Meeks visited her nearly every day. On occasions when defendant was at the hotel, he was required to stay in the lobby. The hotel front desk manager testified that at first defendant's and Meeks's interactions were "normal," but later they became "abusive." The manager and the hotel housekeeper noticed defendant would frequently get angry at Meeks when he thought she stayed too long in her mother's room.

During the six months before the shooting, Meeks was living with her mother at the hotel. One evening defendant arrived at the hotel looking for Meeks; he was very angry; when Meeks came downstairs they started arguing; and when she tried to get away

2

he grabbed her by the arm and slapped her.  The housekeeper testified Meeks told her she wanted to end her relationship with defendant but she was afraid he would kill her if she did.  About three or four days before the shooting, Meeks told the housekeeper she was going to leave defendant and she would never see the housekeeper again.

Several eyewitnesses described the shooting at trial.  As defendant and Meeks were walking on the street, defendant pushed Meeks "really hard" in the chest area, causing her to hit the glass window of a store.  Meeks, dazed from the push, slid to a sitting position against the building and tried to fight with her hands as defendant held her down with one of his hands.  Defendant then pulled out a gun with his other hand and started shooting.  When he was finished shooting, defendant tossed the gun into a planter box, moved a short distance away, and remained on the sidewalk.  Two security guards who were nearby ran to the scene and detained defendant until the police arrived.  When a security guard asked him why he did this, defendant said, " 'That fucking bitch, I have been putting up with this shit for years . . . .' "

After being transported to the hospital, Meeks died the next day.  Meeks's injuries included five gunshot wounds, one in the temple area of her head, one in the rear of her neck, and three in her arm.

In defense, defendant presented testimony from psychologist Richard Kennerly who stated defendant had suffered at least two strokes; he had undergone brain surgery due to bleeding in his brain; and he had brain damage, vascular dementia, and cognitive impairments.  Dr. Kennerly opined that due to his dementia and mental impairments, defendant experienced paranoia, some delusions, and difficulty controlling his impulses

3

when feeling very emotional. When questioned on cross-examination about defendant's impulsivity, Dr. Kennerly opined a person who arms himself with a gun could either be engaging in a premeditated act to kill or could be carrying the gun due to a paranoid state with no intention of using it to shoot someone.

*Jury Verdict and Sentence*

The jury found defendant guilty of first degree premeditated murder with a finding that he personally discharged a firearm causing death. He was sentenced to 50 years to life, consisting of 25 years to life for the murder and 25 years to life for the personal gun discharge.

DISCUSSION

I. *Challenge to Competency Finding*

After several competency evaluations and receipt of expert testimony at a competency trial, the court found defendant competent to stand trial. Defendant argues this finding was erroneous because the evidence showed he suffered from dementia and had severe brain damage which rendered him unable to understand the proceedings and rationally assist his attorney with his defense.

*Background*

On several occasions prior to trial defense counsel told the court that defendant would not communicate with her, and defense counsel eventually became convinced he was not competent to stand trial. The trial court issued several orders that defendant be evaluated for competency, and appointed two mental health professionals (psychologist

4

Valerie Rice and psychiatrist Matthew Carroll) to conduct the evaluations. Dr. Kennerly also evaluated defendant for the defense.

Dr. Kennerly interviewed defendant for about two hours in July 2011, and Dr. Rice interviewed him for about one hour in October 2011. In January 2012, defendant refused to meet with defense counsel. He also refused to cooperate with any further competency evaluations, including a second interview attempted by Dr. Kennerly in January 2012 and interviews attempted by Dr. Carroll in March and August 2012. When Dr. Carroll contacted defendant in March 2012 and tried to ask him questions, defendant said he was fine; he was taking "the Fifth"; and there was already a prior competency report. Dr. Carroll told him the judge had ordered another evaluation, and defendant responded "he's not getting it." When Dr. Carroll said defendant's attorney would also like another evaluation, defendant responded "she's not helping me." When defendant was brought to the interview room in August 2012 to meet with Dr. Carroll, defendant told the deputies he had seen Dr. Carroll before and did not want to talk to him anymore.

At the competency trial in November 2012, Dr. Kennerly testified on behalf of the defense, and Drs. Rice and Carroll testified on behalf of the prosecution. Dr. Kennerly opined that defendant had moderate dementia and he was not competent to stand trial. In contrast, Drs. Rice and Carroll opined that even assuming defendant had some level of dementia, he was competent to stand trial.

Defense counsel also wanted to testify to describe her observations concerning defendant's incompetency, but defendant declined to waive the attorney-client privilege for this purpose. When queried by the court on two occasions, defendant said he

5

understood the privilege; he did not want to waive it; his attorney was not a doctor; he did not want his attorney to bolster the doctors' testimony; and he did not want to "cut her loose." At the competency hearing when defendant was asked if he wanted to testify, he responded, "I'm all right. I'm okay. [¶] . . . [¶] . . . I don't want to testify."

*The Experts' Opinions*

Defendant, age 83, told the experts that he had a third grade education; he had suffered three strokes; the latest one was two years ago; and one stroke required surgery on the left side of his brain. His medical records showed he had suffered a substantial "subdural hematoma," which required surgery to drain blood and fluid from his head. The experts agreed defendant showed no signs of psychosis, hallucinations, or delirium. Further, he was oriented to place (i.e., he knew he was in jail). When questioned about the offense during a recorded police interview and the competency interviews, defendant cried and described being hurt because his wife was seeing other men.

*Defense Expert Opinion*

The defense expert (Dr. Kennerly) diagnosed defendant with "moderate impairment" dementia which had been progressively developing for at least five years. His dementia symptoms included significant difficulty in finding the appropriate words to use when speaking; tangential speaking and the inability to stay on a subject for more than a minute even after redirection back to the topic; paranoia; lack of orientation as to time; and a dramatic difference between his score on a test measuring verbal ability as compared to a test measuring nonverbal ability. Regarding his confusion as to time, defendant thought the year was 2000 rather than 2012, and thought he was 78 rather than

6

83 years old. Defendant's paranoia included a belief his attorney was working with the prosecution to make sure he would be in jail. As compared to other people his age, testing reflected he was low average on concentration and attention; he was mildly impaired on memory, verbal fluency, and use of visual information; he had problems with executive functioning (the ability to understand things); and he had a slowed ability to engage in motor output (i.e., drawing).

Dr. Kennerly testified defendant's overall testing score was in the "impaired range, at 2 percent," meaning 98 percent of the people in his age group perform better than he does in terms of cognitive functioning. His overall "full scale" IQ was 81, which was within the normal range. However, there was a sharp imbalance between his nonverbal ability (controlled by the right side of the brain where he had no surgery) and his verbal ability (controlled by the left side of the brain where he had the surgery). His nonverbal ability was "more or less intact" and in the normal range (62nd percentile), but his verbal ability was "impacted a good deal" (.26th percentile) which meant he was impaired in his ability to engage in verbal reasoning or any kind of verbal abstraction.

Dr. Kennerly explained that persons with defendant's level of dementia might sometimes appear cooperative and attentive but they would have difficulty tracking over a period of time. Defendant could understand concrete, simple matters, but he was cognitively unable to handle large, complex or abstract matters and his ability to make important decisions was akin to a seven-year-old. He had a limited ability to focus; his thoughts would wander; he would have difficulty understanding information that was not simple and that could not be conveyed in a relatively short period of time; and he would

7

be unable to pay attention long enough to see the "big picture" of what he was dealing with. His ability to follow witness testimony would be "spotty" because he would miss and forget critical information. Although he would be able to recall some things that occurred at trial, he would not be able to recall enough to follow the progression of the trial from day to day.

Dr. Kennerly further opined defendant would be able to provide information to defense counsel, but would not be able to engage in verbal abstract thought, including identifying matters that might need to be addressed or assisting with generation of cross-examination questions. As to control over his impulses at trial, Dr. Kennerly stated defendant was not so impaired that he would act on "everything that crosses his mind every moment," but his self-control was impaired and if he was "flooded with feelings" he would have a hard time controlling his impulses. Also, Dr. Kennerly explained people with dementia often display defensive anger to hide their impairment and do not understand people are trying to help them, and opined defendant's lack of cooperation with his attorney was not a conscious choice but a result of his dementia and paranoia.

*Prosecution Expert Opinions*

In contrast, Dr. Rice testified that although defendant had some mild difficulties with the chronology of events, he was oriented as to time; for example, he knew he was going to be 84 on his next birthday and identified when his crime occurred. During the interview with Dr. Rice, defendant's thinking was "fairly logical and linear"; he did not ramble or speak about topics unrelated to her questions; and although he would occasionally become "a little bit tangential" he returned easily to the topic when

8

redirected. Dr. Rice noted that in defendant's jail progress notes, the jail doctor reported defendant provided a "rather convoluted story about being mistreated by the legal system"; defendant told the jail doctor he had seen a psychiatrist after his brain surgery to see if the surgery "had done something to his head"; and defendant's thoughts were "linear to circumstantial and over-detailed."[1] However, the jail doctor assessed there was no clear evidence of psychosis or psychiatric illness and no need for medication. Further, Dr. Rice observed that during the recorded interview with the police, defendant was articulate; at times he was "over-detailed" but could be redirected; and there were no suggestions he was delusional, having problems following the line of questioning, or having cognitive or psychiatric difficulties that impaired his ability to participate rationally in the interview.

When questioned to ascertain his understanding of the nature of the proceedings against him, defendant told Dr. Rice that people could plead not guilty, guilty, or "no novo"; a plea bargain was when you are offered something by the district attorney which you can accept or not; if he was found guilty he would be sentenced and "do time"; and if he was found not guilty he would be released. He knew he had been charged with murder and correctly described the roles of the various court personnel.[2] Dr. Rice

---

[1]    Dr. Rice explained linear thoughts were normal, logical and sequential; circumstantial thoughts were off-topic and "slightly worse than being tangential"; and over-detailed meant giving a lot of details.

[2]    In her written report, Dr. Rice stated defendant said the judge was to " 'represent the law' "; the district attorney was " 'to bring the case to court' " and was on the side of

9

assessed defendant understood what was happening in his case and the strategies available to him, and he had the capacity to assist his counsel in a rational manner if he chose to do so. Defendant's capacity to cooperate rationally with his attorney was supported by his ability to sit through a one-hour competency interview with Dr. Rice and answer her questions in a "fairly articulate, straightforward manner."

Dr. Carroll, who acknowledged his evaluation was limited because he was not able to personally interview defendant, reached essentially the same conclusions as Dr. Rice based on his short contact with defendant and his review of the various reports and the recorded police interview. Dr. Carroll testified that during the five-minute conversation when defendant refused to be interviewed, defendant's answers were logical and he did not appear paranoid to Dr. Carroll. Dr. Carroll stated defendant's interview with Dr. Rice reflected defendant had a basic understanding of what was happening in his case, including he knew why he was in jail and that he was charged with murder, he understood the roles of the court personnel, and he knew he could agree to a plea bargain. Further, when interviewed, defendant showed he could cooperate and talk about what occurred during the crime, including that his wife was cheating on him, he was upset when he went to confront her, and he "just snapped."

Drs. Rice and Carroll diagnosed defendant with adjustment disorder with depressed mood; Dr. Carroll added a diagnosis of "possible vascular dementia" based on defendant's stroke. The prosecution experts questioned the accuracy of Dr. Kennerly's

the state; the public defender was to " 'defend' "; and the jury was to " 'figure out the truth. They offer a verdict of guilty or not guilty.' "

moderate dementia diagnosis, explaining if such matters as defendant's limited level of education, ethnicity, and fatigue during the testing process were taken into account, Dr. Kennerly's test results suggested his dementia was mild rather than moderate. Further, there were no indications that his cognitive deficits caused a serious impairment in his daily functioning, or that they caused him to be unable to understand the basics of what was occurring in his case or to rationally assist his counsel.

These experts stated to be competent to stand trial, a defendant did not need to have a detailed legal understanding, but only needed to understand the basics of the proceedings. They noted Dr. Kennerly's examination of defendant failed to address defendant's understanding of the legal proceedings, and defendant's statements during the interview with Dr. Rice reflected he understood the basics and was able to cooperate.

Additionally, the prosecution experts did not view defendant as suffering from paranoia that made him incapable of cooperating with his counsel. Instead, they assessed he may have refused additional competency evaluations because he was frustrated with the repeated evaluations and saw no purpose for more. Although it appeared he distrusted the legal system and his attorney, the experts stated this was common among criminal defendants, who often "tak[e] out" their feelings of frustration and anger on those who are trying to work on their behalf and believe their attorneys are not helping them or doing what they want.

*Other Miscellaneous Statements by Defendant During the Proceedings*

The experts also addressed the significance of defendant's apparent fixation on a belief that he had not been arraigned. During the course of the proceedings, defendant

11

repeatedly complained he had not been arraigned and his case should therefore be dismissed, even though the court explained to him that he had been arraigned. Dr. Kennerly testified defendant's repeated complaints on this point could be the result of his dementia in that he does not remember the arraignment proceeding, or could be the result of a fixed delusion that would not change even if contrary evidence was presented to him. In contrast, Drs. Rice and Carroll testified his repeated comments about the arraignment could be caused by his limited education and lack of understanding of specific legal jargon and how the judicial process worked. Dr. Rice opined his confusion did not rise to the level of being unable to learn about how the process worked. Dr. Carroll stated someone may have told him an arraignment had to occur in a certain time or the case could not go to trial and he was "sticking with that" as a defense, but this did not show his belief was related to a mental illness.

During the competency trial defense counsel queried Dr. Kennerly about statements made by defendant during a break in Dr. Kennerly's testimony, in which defendant essentially stated Dr. Kennerly "came and asked him to draw a box, but there was no interview and there was no discussion." When defense counsel told Dr. Kennerly that defendant said they had met only for 20 minutes, defendant interjected "45 [minutes]." Continuing with her questioning, defense counsel asked Dr. Kennerly if it was true, as claimed by defendant during the break, that they met for 45 minutes, there was no discussion, defendant did not take any tests, and at one point Dr. Kennerly told him that he could not keep talking to defendant and he had to go. Dr. Kennerly responded they met for about two hours, they had an extensive conversation, he did

12

administer the tests, and it was defendant who reached a point of fatigue and was not willing to continue with any more testing.

*Trial Court's Ruling*

After the presentation of evidence, the prosecutor argued that although defendant may have some form of dementia, the record showed he understood what was happening and he was making volitional choices about whether to interact with people and whether to assist his counsel. The prosecutor stated defense counsel's reopening of her examination of Dr. Kennerly based on defendant's comments during the break showed defendant was listening during Dr. Kennerly's testimony even if defendant's assertions were "misguided or not necessarily true." Further, when the court asked defendant if he wanted to waive the attorney-client privilege, defendant's response was logical, coherent and unequivocal.

Defense counsel argued the preponderance of the evidence showed defendant had dementia; he was confused and misunderstood things; he was refusing to meet with the doctors and defense counsel; and he was not capable of rationally assisting counsel.

The court found defendant understood the nature of the proceedings; he was capable of assisting his counsel; and if he was choosing not to cooperate this was a volitional choice not the result of dementia. The court stated defendant may be confused about some things and sometimes "get off track," but his interview with Dr. Rice showed it was "easy to get him back on track," and the in-court discussion of his attorney-client privilege reflected his ability to think and make a decision. The court also observed Dr. Kennerly's evaluation failed to address the details of the relevant forensic questions, such

13

as whether defendant knew what his attorney did and what his defense was, and it was not unusual for unsophisticated criminal defendants such as defendant to fixate on what they perceive as a technical defense when they cannot deny they committed the crime. Regarding defense counsel's claim defendant could not assist in his defense, the court commented it did not understand what level of assistance defense counsel thought was required in this particular case, and it appeared defendant "understands what's happening."  The court concluded the defense had not shown defendant was incompetent to stand trial.[3]

## *Analysis*

A defendant is incompetent to stand trial if the defendant has a mental disorder that makes the defendant "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (*People v. Dunkle* (2005) 36 Cal.4th 861, 885.)  The existence of mental impairments or cognitive deficits do not, standing alone, mean the defendant is incompetent to stand trial.  (See, e.g., *People v. Mai* (2013) 57 Cal.4th 986, 1035-1036, fn. 17 [competent even though defendant had possible brain damage]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1064 [competent even though defendant engaged in "rambling, marginally relevant speeches" suggesting some sort of mental illness].)  The courts have recognized that although self-

---

[3]    After the trial court's ruling on competency and as the proceedings continued on various dates, defense counsel again requested a competency determination based on defendant's ongoing statements suggestive of confused thinking.  The court denied the request, stating it believed defendant was "choosing to believe what he wants to believe to further his narrative that he's been wronged somehow by the system.  I think he understands what's going on in court."

representation may be impeded by a defendant's " ' "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses . . . ," ' " these symptoms do not necessarily prevent the defendant from being able to work with defense counsel and " ' "play the lesser role of represented defendant." ' "  (*People v. Johnson* (2012) 53 Cal.4th 519, 527 [discussing standard for self-representation].)

A defendant is presumed competent and bears the burden of showing incompetency by a preponderance of the evidence.  (*People v. Dunkle, supra*, 36 Cal.4th at p. 885; *People v. Marshall* (1997) 15 Cal.4th 1, 31.)  On appeal, we determine whether substantial evidence, viewed in the light most favorable to the ruling, supports the finding on competency.  (*Dunkle, supra*, at p. 885.)

Drawing all reasonable inferences in favor of the court's ruling, the record supports the competency finding.  During a one-hour interview, Dr. Rice observed defendant to be logical and linear and able to stay on topic with some redirection. Likewise, the record supports he was able to rationally talk about the facts of the offense from his perspective during a recorded interview with the police.  All experts agreed he had no psychoses or hallucinations that placed him out of touch with reality.  He exhibited a basic understanding of the criminal proceedings against him and the role of the court personnel.  Although on some occasions defendant appeared to be speaking in a confused or less than fully rational manner, on other occasions he was able to engage in logical communications and make decisions, including whether to cooperate with additional competency evaluations, waive the attorney-client privilege, and testify at trial.

15

The court could reasonably assess that although he might be a difficult client due to his educational level, age, and possible dementia causing confused thinking and memory deficits, he had sufficient cognitive abilities to describe to defense counsel what occurred during the offense and to understand the basics of what was occurring in the proceedings. Further, the court could ascertain that to the extent defendant might have difficulty understanding the complexities of the legal proceedings and the progress of his trial, his representation by counsel ensured that he would be informed of what was occurring and have a fair presentation of the defense case.

There was nothing in the testimony of the defense expert that compelled the court to find defendant incompetent to stand trial. Dr. Kennerly acknowledged defendant could understand and communicate simple information, and the court could reasonably determine this was sufficient to allow defendant to understand the proceedings and assist his counsel with his defense. Although Dr. Kennerly opined defendant's refusal to cooperate with his counsel was caused by his dementia and paranoia, the prosecution experts disagreed and instead attributed it to a distrust of the legal system and counsel, a perspective not uncommon among criminal defendants. (See, e.g., *People v. Welch* (1999) 20 Cal.4th 701, 742 [competent even though defendant had "paranoid distrust of the judicial system" and claimed "his counsel was in league with the prosecution"].) The court could properly find defendant's mental state did not rise to the level of paranoia inhibiting his conscious choices and his decision whether to cooperate was within his control.

16

To support his challenge to the court's competency finding, defendant argues Dr. Rice used an overly high incompetency standard by requiring a severe mental illness or severe mental deterioration, and the trial court may have been misled and likewise used this improper standard. The contention is unavailing. The record shows Dr. Rice ruled out any severe debilitating mental conditions when evaluating defendant, but there is nothing to suggest either she or the court was using these conditions as the defining competency standard rather than merely as relevant factors to consider. To the contrary, both Dr. Rice and the court referred to the correct standard: whether the defendant can understand the nature of the proceedings and rationally assist in his defense.

The record supports the court's finding on competency.

## II. *Claim that Sentence Is Cruel and Unusual Punishment*

Defendant argues that given his age, his sentence of 50 years to life is effectively a sentence of life without parole. (See *People v. Caballero* (2012) 55 Cal.4th 262, 265, 268-269 [110-year life sentence with parole can, for constitutional purposes, equate to life without parole].) For the first time on appeal, he contends imprisoning him for the remainder of his life is unconstitutional cruel and unusual punishment because he is severely brain-damaged and—akin to juvenile and mentally retarded defendants—this diminishes his moral culpability and makes his life sentence lack any legitimate penological justification.

A sentence violates the constitutional proscription against cruel and/or unusual punishment if the punishment is grossly disproportionate to the severity of the crime or the defendant's individual culpability, or it shocks the conscience and offends

fundamental notions of human dignity. (*People v. Hines* (1997) 15 Cal.4th 997, 1078; *People v. Russell* (2010) 187 Cal.App.4th 981, 993.) When evaluating the constitutionality of a punishment, the court examines the circumstances of the offense, extent of the defendant's involvement, manner in which the crime was committed, and consequences of the defendant's acts, as well as the defendant's personal characteristics, including age, prior criminality, and mental capabilities. (*Hines, supra*, at p. 1078.) On appeal, we view the facts in the manner most favorable to the judgment and then resolve the issue as a matter of law. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

Defendant's claim of unconstitutionality is unavailing. First, it is not shocking to send him to prison for the rest of his life for fatally shooting his unarmed wife, and the sentence serves the legitimate purpose of protecting society from any further violent conduct by him. Second, the factual issue of defendant's reduced moral culpability due to mental deficits was not addressed by the trial court because it was not raised below; hence this claim is forfeited on appeal. (*People v. Russell, supra*, 187 Cal.App.4th at p. 993.) Further, on the record before us there is nothing that compels a finding that defendant's mental deficits were so severe that his moral culpability for the shooting was reduced.

Third, even if, arguendo, defendant was viewed as less morally culpable due to brain damage from his strokes and brain surgery, he has not shown that imprisonment for the remainder of his life is cruel or unusual punishment. The cases he has cited to support his argument are distinguishable. For example, in *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 2460, 2466-2469], the high court held that under constitutional

proportionality principles, when sentencing juvenile offenders for murder, trial courts should not be required to impose life sentences without the possibility of parole, but rather should have the discretion to select (for example) life sentences with the possibility of parole based on the defendant's youth and the circumstances of the crime. *Miller* did not establish a blanket rule that a cognitively-deficient defendant who commits murder cannot constitutionally receive a sentence that does not allow for parole. (See *id.* at pp. 2465-2470 [categorical bar on life without parole for juveniles applies only to *nonhomicide* offenses; homicide offenses committed by juveniles require individualized sentencing decision]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1389-1390 [discretionary life without parole sentence may be imposed on juvenile for homicide offense upon consideration of relevant factors].) Moreover, unlike juveniles—for whom mandatory life without parole sentences are precluded due to the prospects for rehabilitation as their brains develop (*Miller, supra*, at pp. 2460, 2465-2468)—defendant has not shown his mental condition could be improved to make him safe if released so as to constitutionally mandate consideration or imposition of a sentence that might realistically allow for his release.

Also, defendant's citation to cases precluding *death* sentences for mentally retarded persons and juveniles (see *Atkins v. Virginia* (2002) 536 U.S. 304, 318-321; *Roper v. Simmons* (2005) 543 U.S. 551, 568-575) does not advance his position because defendant was not sentenced to death. Indeed, sentences of life without parole—rather than death—have been deemed appropriate for mentally retarded or brain damaged defendants. (See, e.g., Pen. Code, § 1376, subd. (c)(1) [intellectually disabled defendants

19

who commit capital offense must be sentenced to life without parole, not death]; *Crook v. State* (Fla. 2005) 908 So.2d 350, 358-359 [for constitutional proportionality reasons, death sentence reduced to life without parole for brain-damaged defendant].)  These sentencing dispositions implicitly recognize that in appropriate circumstances it is not cruel or unusual punishment to send a defendant with mental deficits to prison for the rest of his or her life.

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.