Filed 9/29/14  P. v. Dang CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>QUANG DANG,<br><br>     Defendant and Appellant. | D063310<br><br><br><br>(Super. Ct. No. SCD229101) |


APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L. Garland, Assistant Attorneys General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Quang Dang of second degree murder of his cohabitant Myra Supiping. (Pen. Code,[1] § 187, subd. (a).) It found true an enhancement that he had used a deadly weapon in committing the murder. (§ 12022, subd. (b)(1).) In separate proceedings, Dang admitted he previously committed assault with a deadly weapon. The court found he had a serious felony and a prior strike conviction within the meaning of the "Three Strikes" law. (§§ 245, subd. (a)(1), 667, subds. (a)(1) & (b)-(i), 668, 1170.12, 1192.7, subd. (c).)

The court denied Dang's request to strike his prior strike conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and sentenced him to a total term of 36 years to life as follows: 15 years to life on the murder count, doubled for the true prior strike finding, and a consecutive five-year term for the prior serious felony, and another consecutive one-year term for the weapons enhancement.

Dang contends: (1) there was insufficient evidence to support his conviction for second degree murder because he did not form the requisite intent; (2) alternatively, his murder conviction should be reduced to voluntary or involuntary manslaughter because he acted in the heat of passion during a sudden quarrel; (3) the court erroneously denied his *Romero* motion and (4) his sentence violates state and federal constitutional prohibitions against cruel and unusual punishment. We affirm the judgment.

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

Dang and Supiping cohabited for approximately eight years. They lived with Dang's mother, stepfather, and two sisters in San Diego. Starting in approximately July 2010, Dang used a telephone chat line to talk with women, and shortly afterwards he introduced it to Supiping, who started calling the chat line to talk with men. Dang became upset because the July 2010 telephone bill was approximately $1400. Despite the fact Dang repeatedly questioned Supiping about how they would pay the bill, Dang's stepfather testified Supiping "never really responded. She always kept quiet." Eventually, the bill was paid.[2] Supiping continued using the chat line, and the next month's bill also was high.

In the week before the murder, Supiping and her younger son went to stay at her mother's house, while the older son, who was approximately seven years old, stayed with Dang. Dang cried frequently regarding her departure, telephoned her often, and enlisted her brother to talk to her about her excessive chat line calls and the need to keep their family together. Around that time, Dang was further upset to learn from his older son that Supiping had taken their children with her on dates with men from the chat line.

_____

[2] The record includes conflicting evidence regarding the size of the first telephone bill and who paid it. Dang's stepfather testified Dang paid the approximately $1400 bill. Dang told police his stepfather, who was sick and unemployed, paid the bill that was approximately $400. Dang also said the following month's bill was approximately $1300.

3

On August 10, 2010, Supiping's brother drove her back to Dang's house between 8:00 p.m. and 9:00 p.m. Dang went to hug Supiping but she told him, "Don't touch me." Dang began to laugh. The brother noticed Dang appeared to have been drinking. He told Supiping and Dang not to argue.

Dang's stepfather, Larry McNeil, also noticed Dang had been drinking alcohol that night. Therefore, he spoke to Dang for approximately 30 minutes, advising him not to argue with Supiping. Dang assured him he was going to bed and would not argue or cause any problems. Dang went to his bedroom, which was located in a downstairs section of the split level house. Approximately 45 minutes to an hour later, Dang's stepfather heard a loud scream coming from Dang's room and rushed there. Supiping was bleeding and sitting slumped on the bed. She said Dang had stabbed her and left. The couple's two sons were asleep on the bed next to Supiping. Dang's stepfather called 911. When an ambulance arrived minutes afterwards, Supiping was unconscious and had no pulse. She died shortly afterwards.

Approximately an hour and a half after the stabbing, Dang telephoned his stepfather, who told him to turn himself in to police. Dang refused. About half an hour later, Dang telephoned his stepfather again and they agreed to meet. The police accompanied the stepfather to the meeting, where they detained and arrested Dang.

*Dang's Police Interview*

The next morning, police interviewed Dang. The interview videotape was played for the jury. Dang said he started using the chat line and introduced Supiping to it and she got "hooked on" it, resulting in large telephone bills. Dang told police that Supiping

4

had met about three or four men, and therefore she had no respect for him or their children, whom she had taken along with her to the meetings.

When Supiping was staying at her family's house in the days before the murder, Dang had telephoned her often to ask about their younger son and speak with him. Dang said Supiping started yelling and she "get attitude with me." She told Dang: "Why are you worried about it? Why—why are you calling all the time?"

Dang stated that the night of the murder, he had drunk some beer. During their argument, he started talking to Supiping about the phone bill. She got mad and started "getting attitude" with Dang, saying, "I don't wanna talk about that." Supiping hit Dang with a stick, which he managed to grab. He got "pissed off," climbed up the stairs to the kitchen, got a knife, returned to the bedroom and stabbed her in the neck and chest an estimated three or four times. Supiping was sitting up while Dang was stabbing her and she told him, "Leave me alone" and, "Stop." He did not realize she would die. He told police he loved Supiping and did not mean to kill her; rather, he did not know what he was doing. After the stabbing, Dang went for a walk and realized, "[O]h, oh, oh, I messed up." He threw the knife in a rain gutter.

During the interview, a detective asked Dang to explain the difference between right and wrong. Dang explained that the right thing to do was to "just walk away, call the police," adding, "or just walk away, get some fresh air. When I calm down, just go home." Dang explained that to hit somebody is wrong. Dang acknowledged to police: "I gonna get locked up. I know what I did was wrong. I realize that." At the end of the

interview, Dang said that if police let him see his sons, he would show police exactly where he had thrown away the knife. Dang later helped police locate the knife.[3]

*Police Investigation and Forensic Evidence*

A police officer searched Dang's bedroom, a laundry room and another room in the house but did not find the stick that Dang mentioned in his interview. The police officer acknowledged he did not search the entire house or ask the family members, paramedics or other police officers about the stick.

Criminalist Annette Peer had examined and reconstructed the crime scene. She testified that based on the blood stains found in the bedroom, Supiping was stabbed either while she was sitting or lying on the bed.

A pathologist performed the autopsy and testified there were nine stab wounds on Supiping's torso and extremities, and a number of cuts on her extremities. He stated, "four of the nine wounds penetrated into the chest cavity. And there were injuries to her left lung, the main pulmonary artery which is a large blood vessel coming off of the heart, the aorta, and a portion of the left shoulder blade was cut, and also a rib was cut." He concluded the manner of death was homicide and the cause of death was multiple stab wounds.

*Defense Case*

Dang's mother, My McNeil (McNeil), testified Dang was born in Vietnam in 1975, and his father is an American. Dang could not walk until he was six years old.

---

[3]     The prosecutor described the weapon in closing argument as "a long, sharp knife, perfect for cutting meat."

There were no doctors available to treat him in Vietnam at that time. Many times children chased and beat Dang because he was of mixed race. He studied in school for about three years but was unable to learn. Dang and his mother spent approximately seven months in a refugee camp in the Philippines. In 1986, they moved to the United States.

Dang's mother testified Dang has received psychiatric treatment since he was eleven years old. He attended special education classes in the United States but never learned to read and write. He never made close friends. He and Supiping had been happy together until the problems with the chat line began. McNeil overheard one of Supiping's telephone conversations and described it as "very sexual."

When Dang's older son told him that Supiping had taken him to meet her dates, Dang became very sad because he loved Supiping very much. Dang cried every day she was away, and told his mother he did not know what to do. McNeil advised him, "Just let her be, because, you know, if you're trying to keep her, you are just keeping her body physically but not her soul." Dang responded, "Okay" but McNeil was unsure whether Dang understood her advice.

*Expert Witness Testimony*

In 1987, psychologist Jeremy Madoff evaluated Dang, who was 11 years old, but appeared immature for his age. Dang also appeared sad, and Dr. Madoff concluded it was "related to issues of loss, rejection and fears of abandonment." Dr. Madoff recommended that Dang receive psychotherapy.

7

Psychiatrist Trang Nguyen testified she started treating Dang in 2001. She adopted the previous psychiatrist's diagnosis of Dang as having "hallucination, irrational thinking, disorganized behavior" and "schizophrenia, undifferentiated." Dr. Nguyen initially diagnosed Dang with psychosis not otherwise specified but she reverted to the schizophrenia diagnosis. Dr Nguyen described Dang as exhibiting "primitive" and "immature thinking," and being "impulsive." Dr. Nguyen noted Dang had improved after he was prescribed the drug Risperdal. In the last year before Supiping's death, Dang did not miss any appointments with her. Moreover, he had better eye contact and acted appropriately until the sessions ended and he was dismissed. Dang was proud of Supiping and his children and seemed happier after his second son's birth.

Forensic and clinical psychologist Clark Clipson evaluated Dang in January 2006, and interviewed Dang's mother and stepfather. Dr Clipson testified regarding the hardships Dang experienced in Vietnam, and the fact Dang was enrolled in special education classes and completed up to the 11th grade in the United States. A social service agency evaluated Dang, concluding his mental age was between six and eight years old. Dr. Clipson said Dang was a loner who had never kept a job for long. Dang's emotional and behavioral problems caused him to become easily frustrated and exhibit aggressive tantrums.

Dr. Clipson testified Dang had difficulty controlling his impulses, and "if [Dang] wants something, he wants it now." He testified Dang suffered from seizures and depression. Dr. Clipson asserted that every medical professional who administered an I.Q. test to Dang diagnosed him with "mild mental retardation," which is "by convention

8

defined as I.Q. scores from 55 to 70." Dr. Clipson testified Dang's "overall I.Q. score was 62. There was a significant difference between his score on measures of performance I.Q. as opposed to those that measure verbal skills. His performance I.Q. was a 69. [¶] . . . Those tests are . . . relatively free of factors related to culture, language and educational background, whereas the verbal tests obviously are more dependent on those kinds of factors. His verbal I.Q. was a 54."

Dr. Clipson diagnosed Dang with adjustment anxiety disorder and "mild mental retardation, as well as personality disorder not otherwise specified with avoidant and dependent features." Dr. Clipson elaborated: "In Mr. Dang's case, he's overly dependent on other people and relies on others to make decisions for him, to take care of him, to meet his daily needs. And that's not necessarily inappropriate given his developmental and cognitive functioning. But it simply conveys that he's unable to make decisions for himself and take care of himself in the way that most people could. [¶] He's also avoidant in the sense that . . . he's had a number of negative social experiences between his biological grandfather, the abandonment by his father and negative peer experiences, so he is reluctant to spend time with other people to make new friends because he's afraid he's not going to be liked. And so he avoids being around other people unless he has that kind of reassurance that he's going to be accepted."

Clinical psychologist Pauline Hsieh counseled Dang from 2006 to 2009, and concluded he had below average I.Q. During those three years, Hsieh taught Dang anger management skills. Dang reported to Hsieh that he was using the coping skills she had taught him, and would walk away to deal with his anger. By 2009, Dang showed

9

improved judgment by attending group sessions regularly and seeing his doctor for medications. In a 2009 mental status exam, Hsieh classified Dang's insight as "adequate," and gave him the highest possible rating of "normal" for his judgment.

Psychologist Katherine Di Francesca evaluated Dang in 2011 and diagnosed him with psychosis not otherwise specified, mild mental retardation and alcohol abuse. Relying on a hypothetical that tracked the facts of Supiping's murder, she testified it was unlikely the perpetrator would have specifically intended to kill the victim; instead, he likely acted rashly. On cross-examination, relying on the same hypothetical as on direct examination, Dr. Di Francesca testified the perpetrator would have known the nature and quality of his acts, and that he was stabbing a human being who was his loved one. She testified that the perpetrator's decision to go to the kitchen for a knife could be considered "goal-directed behavior." Further, he would have acted in a "frenzy" when he stabbed his victim nine times.

*Motion for New Trial or Modification of Verdict*

Dang moved for a new trial under section 1181 on grounds he did not commit second degree murder because he acted from heat of passion. Pointing to his mental condition, intoxication, and Supiping's decision to date other men, he concluded that the evidence, at best, proved he had committed voluntary manslaughter. The People opposed

10

the motion, arguing sufficient evidence supported the verdict, and Dang had acted with

malice.  The court denied the motion.[4]

---

[4]     In denying the new trial motion, the court reasoned:  "[I]t was pretty clear at the time of [Dang's police] interview that he knew what he had done and why . . . .  He talked in that interview about [Supiping] cheating on him and taking the kids on at least one of the dates, and . . . he was angry as a result of that.  He did perseverate with respect to him loving her and how mad he was about that.  But he claimed . . . both this anger over that but also self-defense, his assertion that she had hit him with a stick.  My view of the evidence, frankly, I don't find that very credible.  Seemed like an unlikely scenario that she allegedly possibly brought this stick in from outside or somewhere else.  There wasn't a stick found.  But I do agree with [defense counsel] . . . that it was [a] pretty weak search of the house for an alleged stick that was maybe involved in the crime.  The areas that were searched did not reveal a stick.  [¶]  But in any event, he claimed that he was hit by the stick, grabbed it and threw it down, and then went out of the room, went up the stairs into the kitchen, found a knife, a large knife, came back down and went through what I already discussed.  [¶]  So from that, I don't think it's unreasonable for a jury to conclude that, whether or not he was angry and emotional . . . that he knew what he was doing.  He had the time.  One, that he had the intent, his intent through all those actions was to get a knife to come back to inflict deadly injury.  But, also, that if he was responding initially out of passion or emotion, that the time and thought that would accompany that trip into the kitchen would negate it or could negate it.  [¶]  So the issue of whether or not the evidence is sufficient to support the jury's verdict, I think it is sufficient to support the jury's verdict for all the reasons I just said.  [¶]  . . . I was surprised when I watched the interview at how together [Dang] was when I expected someone who was going to be, I guess, less coherent given his mental health issues in his background.  [¶]  Also note that he negotiated with the officers in a pretty savvy fashion regarding his efforts to see his kids before he went off to jail.  He was making an attempt to exchange information about the location of the knife in exchange for one last visit with his kids, and that ended up not happening.  But he had quite a back and forth about that. "
        The court concluded, "But looking at the evidence independently and weighing the evidence, you know, I find the evidence to be believable.  That series of events that preceded and during and then after the actual attack to me shows someone who did intend to inflict those injuries that put [Supiping's] life in jeopardy and was not solely out of impulse and out of no control at all.  So I don't find cause to grant a new trial under [section 1181]."  For the same reasons, the court denied Dang's motion to modify the verdict to voluntary or involuntary manslaughter.

11

DISCUSSION

I.

Dang contends that as a matter of law the evidence was insufficient to support a finding he acted with malice aforethought; rather, pointing to the combined effects of his mental retardation, mental illness and intoxication, he claims, "There was overwhelming evidence in this case of 'diminished actuality' to show that [he] actually lacked the mental state of malice aforethought to support a murder conviction." He further argues that as a matter of law, Supiping's killing was involuntary manslaughter because it occurred without malice in the commission of an inherently dangerous assaultive felony.

*Applicable Law*

Here, the court instructed the jury on the law regarding murder with CALCRIM Nos. 500 [homicide]; 520-521 [first or second degree murder with malice aforethought and first degree murder]; 505 [self-defense]; 570 voluntary manslaughter: heat of passion]; 571 [voluntary manslaughter: imperfect self defense] and 580 [involuntary manslaughter].

First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation. (*Ibid.*) Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life). (*Ibid.*) To reduce the offense to second degree murder, premeditation and deliberation may be

12

negated by intoxication or heat of passion from provocation. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306; see *People v. Hughes* (2002) 27 Cal.4th 287, 342.)

Even when a defendant has the intent to kill or conscious disregard for life, a homicide may be further reduced to voluntary manslaughter in limited, explicitly defined circumstances that are viewed as negating malice. (*People v. Moye* (2009) 47 Cal.4th 537, 549; *People v. Lasko* (2000) 23 Cal.4th 101, 107-109.) For voluntary manslaughter, malice is deemed to be negated by the defendant's (1) heat of passion arising from provocation that would cause a reasonable person to react with deadly passion, or (2) unreasonable but good faith belief in the need to act in self-defense (imperfect self-defense). (*Ibid.*) Under these two limited circumstances, malice is negated even though the lethal act was committed with the intent to kill or conscious disregard for life that otherwise establishes malice. (See *People v. Bryant* (2013) 56 Cal.4th 959, 968; *People v. Rios* (2000) 23 Cal.4th 450, 460-461, 467.)

An unlawful homicide without intent to kill and without conscious disregard for life is involuntary manslaughter. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) Involuntary manslaughter can arise from a lawful act, a misdemeanor, or a noninherently dangerous felony committed with criminal negligence; that is, aggravated, reckless conduct that creates a foreseeably high risk of death. (*Id.* at pp. 1006, 1008.)

"To support a defense of 'diminished actuality,' a defendant presents evidence of voluntary intoxication or mental condition to show he 'actually' lacked the mental states required for the crime." (*People v. Clark* (2011) 52 Cal.4th 856, 880, fn. 3.) "[T]he jury may generally consider evidence of voluntary intoxication or mental condition in

13

deciding whether defendant actually had the required mental states for the crime."
(*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)  A verdict of involuntary manslaughter
is warranted where the defendant demonstrates " 'that because of his mental illness . . . he
did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought).' "
(*People v. Rogers* (2006) 39 Cal.4th 826, 884.)  Voluntary intoxication, however, cannot
negate implied malice.  (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1376-1377.)

When a defendant challenges his or her conviction for insufficient evidence on
appeal, we apply the substantial evidence standard of review.  "Under this standard, the
court 'must review the whole record in the light most favorable to the judgment below to
determine whether it discloses *substantial evidence*—that is, evidence which is
reasonable, credible, and of solid value—such that a reasonable trier of fact could find the
defendant guilty beyond a reasonable doubt.' [Citations.]  The focus of the substantial
evidence test is on the *whole* record of evidence presented to the trier of fact, rather than
on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)
We "must presume in support of the judgment the existence of every fact the trier could
reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)
"The standard of review is the same in cases in which the People rely mainly on
circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

Because there is rarely direct evidence of a defendant's knowledge (*People v.
Buckley* (1986) 183 Cal.App.3d 489, 494-495) or intent (*People v. Chinchilla* (1997) 52
Cal.App.4th 683, 690), these matters generally must be established by circumstantial
evidence and the reasonable inferences to which it gives rise.  (*People v. Smith* (2005) 37

Cal.4th 733, 741.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

*Analysis*

We conclude that substantial circumstantial evidence supported the jury's finding Dang stabbed Supiping with implied malice: In the few hours between Supiping's return to Dang's house and when she was killed, two people specifically warned Dang not to argue with her. Supiping's brother did so first, and afterwards, approximately one hour before the murder, Dang's stepfather did so. Nevertheless, Dang elected to argue with Supiping. When the argument escalated, Dang left the bedroom, climbed upstairs, entered the kitchen, selected a large knife that could inflict harm, returned to the bedroom, and stabbed Supiping nine times, including in the neck and chest. (See *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [finding that stabbing a victim in "an extremely vulnerable area of the body" provided substantial evidence of an intent to kill.] She pleaded that he stop and leave her alone. Dang evinced consciousness of guilt by immediately fleeing the house and throwing away his weapon. The jury was instructed regarding consciousness of guilt and flight with CALCRIM Nos. 371 and 372 respectively. On this record, Dang's documented mental illness and intoxication did not

15

preclude the jury from finding he acted with malice aforethought and thus he committed second degree murder.

## II.

Dang alternatively contends that any finding of malice aforethought was negated by overwhelming evidence that he acted out of heat of passion and during a sudden quarrel; therefore, his murder conviction must be reduced to voluntary manslaughter. Specifically, Dang argues: "The suddenness of the stabbing incident is undisputed. It is also undisputed that [he] and [Supiping] argued immediately before the stabbing. [Supiping] was angry when she arrived at [his] house because her brother . . . lectured her about her use of the chat lines, and [Dang] was persistent in his efforts to discuss the matter with her. [Dang] tried to hug [Supiping] when she returned . . . home, but she brushed him off and told him not to touch her. [Supiping] refused to talk to [him] or anyone else about her infidelity and excessive use of the chat lines, incurring exorbitant phone bills they could not afford to pay. [¶] Uncontroverted evidence was presented at trial that [Dang] was visibly distraught in the days and weeks before the killing, particularly during the time [Supiping] left the McNeil home to stay with her family. [Dang] was unconsolable and cried every day. He also called [Supiping] and [her brother] daily during the time [Supiping] was with her family, but [Supiping] refused to talk to him."

*Applicable Law*

The California Supreme Court explained the law regarding heat of passion: "An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually

16

obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele*, *supra*, 27 Cal.4th at pp. 1252-1253.)

In addition, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, *and not belatedly as revenge or punishment.* Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868, italics added.)

The California Supreme Court has stated that adequate provocation for voluntary manslaughter cannot be shown "where the act that allegedly provoked the killing was no

17

more than taunting words, a technical battery, or slight touching." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) The *Gutierrez* court explained, "Defendant testified that he told [the victim], '[g]et off me, you f . . . ing bitch,' and that she 'cuss[ed] back at' him. We have held that calling the defendant 'a "mother f . . . er" and . . . repeatedly asserting that if defendant had a weapon, he should take it out and use it . . . plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment.' [Citation.] . . . [¶] Defendant also testified that [the victim] scratched his chest, he kicked her, she kicked him in the leg and grabbed his shirt, and he pulled away. Simple assault, such as the tussle defendant described, also does not rise to the level of provocation necessary to support a voluntary manslaughter instruction." (*Id.* at p. 827.)

*Analysis*

Even viewing the evidence in the light most favorable to Dang, we conclude there was insufficient evidence of actual provocation by Supiping so as to provide an objective basis for reducing Dang's murder conviction to manslaughter based on heat of passion. The couple's problems began weeks before the murder, and related to Supiping's use of the chat line, her incurring high phone bills and, later, her reportedly taking her children to meet her dates.

Supiping's decision to stay at her mother's house for some days provided an opportunity for Dang to cool down from any provocation caused by Supiping's calling the chat lines and her high phone bills. There is no evidence that Supiping verbally taunted Dang. To the contrary, though Dang unspecifically told police Supiping had an "attitude," he also said her reaction to his scoldings was to refuse to discuss the matter.

18

This case does not present anything close to the taunts found to be insufficient provocation in *People v. Gutierrez*, *supra*, 45 Cal.4th 789. This case is also unlike *People v. Berry* (1976) 18 Cal.3d 509, in which the court relied on the holding in *People v. Borchers* (1958) 50 Cal.2d 321 to the effect that "evidence of admissions of infidelity by the defendant's paramour, taunts directed to him and other conduct" supported a finding that defendant killed in wild desperation induced by the woman's " 'long provocatory conduct.' " (*Berry*, *supra*, at p. 513.)

Dang's discovery that Supiping had reportedly taken the children with her on her dates was not enough to make a reasonable person lose reason and judgment. In any event, he had enough time to cool off from any inflamed passions in the time between his discovery and Supiping's return from her mother's house.

Finally, approximately one hour before the argument, Dang promised his stepfather he would not argue or cause problems. Dang thus had an opportunity to avoid an argument, but he did not take it. After the argument began, Dang was presented with another opportunity to desist from committing the murder. Instead, he engaged in "goal-directed behavior" of leaving the bedroom, climbing upstairs to the kitchen, selecting a weapon, returning downstairs to the bedroom and stabbing her. The jury reasonably concluded Dang acted with reason, and not because his judgment was overcome by passions.

Although Dang testified Supiping hit him with a stick, he told police he grabbed the stick and thus he readily disarmed her. Like the *Gutierrez* court, we conclude that this evidence—amounting to a simple assault—does not rise to the level of provocation

19

that would cause a reasonable person in Dang's position to lose his judgment. (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 826.) Therefore, the properly instructed jury did not err in rejecting the heat of passion defense.

III.

Dang contends the trial court abused its discretion in not striking his prior strike conviction under *Romero*, *supra*, 13 Cal.4th 497. He points out that experts at trial documented his mental health problems, including his limited impulse control. Dang reiterates the arguments he made below that the court should have struck his prior strike "because his diminished mental capacity and mental illness reduce his personal culpability, taking him outside of the spirit of the Three Strikes law." Regarding his future prospects, he argues that if the court had struck the prior strike, he would have received a more appropriate sentence of 15 years in prison, noting that he lacks the mental capacity to be released back into society and will likely be a mentally disordered offender for the rest of his life after he serves his prison term. Therefore, he concludes: The only issue is "which facility best serves the interest of justice—a prison or a hospital for 'mentally disordered offenders.' "

Dang specifically contends: "[D]espite overwhelming, uncontroverted evidence of [his] severe mental and emotional disabilities, the court speculated, absent supporting evidence, that [he] may just be a 'mean-spirited thug' who has engaged in anti-social, self-indulgent, violent behavior."

20

*Background*

At the hearing on Dang's section 1385 motion to strike, Dang's counsel argued that Dang's mental illness played a role in the homicide and the prior strike:  "Mr. Dang does have a significant mental illness that, no matter how you look at this case, played a role in the homicide.  He would not be here today but for the fact that he has the mental illnesses he suffers from.  He wouldn't have the prior strike but for the mental illnesses he suffers now.  They all played a role in creating [Dang]."

Further, relying on the probation report, defense counsel stated:  "I think if we punish Mr. Dang by sending him to prison for 15 years to life, that more than adequately punishes Mr. Dang for the conduct he's engaged in in this case, in addition to the fact Mr. Dang at least recognizes he's taken the life of the one woman he's truly loved in this.  And I think—I don't even think the prosecution is going to dispute the fact that Mr. Dang did significantly love this person.  [¶]  It's going to—it's in addition to the sanction that Mr. Dang is going to be separated from the only support and family he's ever known and placed in a very violent environment.  It's in addition to the punitive sanction that Mr. Dang is going to be separated from the very young children that he loves dearly and that he recognizes that.  It is very—it is in addition to the extreme sanction that Mr. Dang with all of his mental health issues is going to be placed in an environment he can't possibly understand."

The court asked the prosecutor to address the specific defense argument based on Dang's "background and character and his prospects . . . how the longer incarceration might affect him in a more significant way than it might someone otherwise situated."

21

The prosecutor stated:  "[F]irst of all, I want to say [Dang] is not a six-year-old child, he's a 37-year-old man.  He does have mild mental retardation, that's true, it's proven by all the experts.  But he's not a six-year-old boy.  He's a man and  he acts like a man, and he acts like a criminal man, he's been doing it for a long time now.  He's got a long history of that.  [¶]  Defense uses the—his specific words are that this will have 'greater punitive effect' on [Dang] as compared to somebody else.  There is absolutely no evidence of that.  There is no way to know that putting [Dang] in prison compared to the average person on the street is going to affect him mentally more severely than it would the other person."

The court acknowledged Dang's difficult childhood:  "[Y]ou know, I completely agree, when I watch the evidence develop and be presented  and hear this litany of testimony about his background, I will say it was very sad.  I mean very moving.  He [had] a horrible childhood . . . in Vietnam, coming over here and having more difficulties.  It was heart wrenching, no question about it."

The court stated the impression it might have had of Dang separate from his mental health problems:  "But what surprised me when I looked at the probation report, putting his—*if I didn't have this mental health issue*, he just looks like a criminal thug, that's all he looks like.  To say that his strike prior is, well, it wouldn't have happened if it wasn't for his mental health issues, you know, I guess your point is it was a similar situation, he was mad about something, acted out of impulse and couldn't help himself.  But he got into a dispute over a girl basically with another guy who told him sort of back off his treatment of this woman.  [Dang] drove and found the guy, got out of his car and beat him with a baseball bat, and then got in his car and took off."  (Italics added.)  The

22

court continued, "I guess you can argue that, hey, well, yeah, he did that, but he wouldn't have done it if he didn't have these mental health issues. But maybe he wouldn't have done it if he wasn't in some respects a mean-spirited thug. Maybe it was just that. There were other incidents of violence and . . . at least I guess you could characterize it as sort of violent behavior, this antisocial and self-indulgent behavior. [¶] I was surprised to find that he's out driving, driving drunk, fleeing police, going to the local bars. I was surprised by all of that. *Then you have this background—in the background this significant mental health issue.* And is there that strong of a causal effect or is he a person with mental health issues who happens to be sort of criminally minded and not very mindful of his obligation to be law abiding and not attack other people?" (Italics added.)

The court expressed an understanding of defense counsel's argument regarding Dang's mental health, stating: "I could see an argument that [Dang's] overall pathetic and very difficult life arguably puts him outside the spirit [of the Three Strikes law] in the sense of, look, instead of 30 to life, give him 15 to life, maybe he'll get some help down the line that will benefit him and society." The court added, "Those of us who work in the system could make a reasonable inference that someone who is dim-witted and slow would be more vulnerable in prison than someone who isn't, and also not physically very large."

In its final ruling, the court relied on the probation report and summarized Dang's criminal history, starting with the details underlying Dang's 2005 prior strike: "Looking at the particulars of the prior strike conviction . . . the facts as they're related in the

23

probation report include that . . . [Dang] had this friend named Vicky, who's also friends with the victim in the strike case, the fellow named Macintosh. And they had— apparently [Dang] had left some disrespectful and derogatory messages on Vicky's answering machine. [¶] And on the day of the incident, Macintosh runs into [Dang] or met [Dang], confronted him about calling Vicky and told him not to call her again. After an argument, the victim left on foot. [Dang] followed the victim in his truck, stopped the car next to the victim, got out of the car and assaulted him, hitting him about seven times in the head, shoulders and arms with a baseball bat. [Dang] then fled the scene in his car. And the victim managed to walk home where he called the police. At the victim's residence they noted he had blood on his head and elbow, and some pain in his head and shoulder area, and was taken to the hospital." The court noted Dang's prior strike was a "serious strike:" "Dang ended up having a guy that I assume survived it well enough and recovered from his injuries. But [Dang] tracking him down and pummeling him with a baseball bat seven times in the head and shoulders is on the little more serious end of the . . . continuum."

The court referred to Dang's 2007 arrest for driving under the influence: "[Dang] was charged with various offenses including assault and resisting arrest and evading. But the essential facts of that was that he was driving and almost hit two pedestrians in a crosswalk . . . . The officers conducted a traffic stop of him. And he pulled over but then backed his car—after stopping, he then put his vehicle in reverse and backed into the patrol car and then drove off, pursuit ensued, and he eventually pulled over and then ran. He was apprehended outside of a house where a female came to the door and said he

24

lived there.  And there was some back and forth with that female, but the defendant was arrested, struggled and was uncooperative and kicking the patrol car doors and screaming and whatnot.  There was some alcohol found in the car.  He pled out to—I think just to a D.U.I. in that case.  Yeah, with alcohol allegations I believe."

The court described Dang's act of vandalism in 2008:  "[Dang] was charged with vandalism for smashing the front window of a car that belonged to a victim, I believe in his neighborhood, but the victim said that Dang . . . had been harassing him for some time and they had a history of disagreements.  [Dang] busted in the front window of—the windshield of his car."

The court continued: "And then in 2010 you have the instant offense.  There were a couple of other uncharged things having to do with [Dang], one with him being drunk in public and being seen smashing a window of a car and then scratching the car, and it's unknown what happened to that.  . . .  And the other was subsequent to the strike conviction, he had an argument with somebody over rent money, it was his cousin, and punched him in the back of the head five times.  When Dang was questioned, he said that the victim had fallen down and hit his head.  Unknown what happened with that case, I'm not sure why that is."

The court concluded that after suffering the prior strike, Dang "[did not] perform well being supervised"; rather, "he has continued conduct that is criminal in nature and dangerous to society," including by committing the instant serious offense.  Therefore, the court denied the *Romero* motion*,* ruling:  "*Even with the mental health background*

25

*and what I consider to be a very sympathetic initial history*, I don't find him falling outside the spirit of the scheme, the three strikes scheme." (Italics added.)

*Applicable Law*

The purpose of the Three Strikes law is to "ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious and/or violent offenses." (§ 667, subd. (b).) A defendant who commits any felony with one strike prior must be sentenced to twice the base term of the current felony. (§ 667, subd. (e)(1).)

Section 1385, subdivision (a) allows a court to dismiss strike priors in "furtherance of justice." There is a "legislative presumption that a court acts properly whenever it sentences a defendant in accordance with the three strikes law." (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) Departure from this presumption will be justified by extraordinary circumstances only. (*Id*. at p. 378.) The question is " 'whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*Id.* at p. 377.) We review the trial court's decision to not strike a prior strike conviction for abuse of discretion. (*Id.* at p. 376.)

As explained by the California Supreme Court, two legal principles guide our review: First, " ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational and arbitrary." ' " (*People v. Carmony*, *supra*, 33

26

Cal.4th at p. 376.) If this is not shown, the trial court " ' "is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Id.* at pp. 376-377.) Second, a " ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*Id.* at p. 377.) Thus, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*) " '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Id.* at p. 378.)

*Analysis*

We conclude the court acted well within its discretion in refusing to strike Dang's strike prior. As set forth above, the court relied on the probation report documenting Dang's lengthy criminal history, which it analyzed in light of the *Romero* factors. As Dang acknowledges, the court's comments demonstrated its understanding of Dang's childhood hardships.

We recognize Dang regards the trial court's remarks comparing him to a "criminal thug" as "unsupported speculation" going "contrary to the overwhelming evidence of [Dang's] significantly impaired ability to think rationally and control his impulses," thus indicating the court erred in its *Romero* analysis. But we disagree. Understood in context, the court's statement was not objectionable as it was responding to defense

27

counsel's assertion that Dang's mental illness played a role in Dang's prior strike and the murder. The court merely questioned whether, and to what extent, Dang's criminal conduct was instead attributable to a tendency to engage in thuggish behavior. We note the court's ruling did take into account that "even with [Dang's] mental health background," he did not fall outside the spirit of the Three Strikes law. Accordingly, we discern no abuse of discretion.

IV.

Dang contends his sentence is cruel and usual punishment and grossly disproportionate to his individual liability, arguing that because he was 37 years old at sentencing, he "will serve most, if not all, of the 36-year portion of his indeterminate term before he will be eligible for parole. He will be 73 years old by that time. [¶] There is also a significant likelihood that [he] will not be eligible for parole at the earliest possible date, because his severe mental and emotional disabilities impair his ability to understand and comply with prison rules. Thus [he] will likely spend the remainder of his life in prison."

The People assert that Dang did not raise the issue of cruel and unusual punishment in the trial court. Some courts have held that when the issue of cruel and unusual punishment is not raised at the trial level, it is waived on appeal. (*People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) Nevertheless, we will assume Dang did not waive the contention on appeal.

A sentence violates the constitutional proscription against cruel and/or unusual punishment if the punishment is grossly disproportionate to the severity of the crime or

28

the defendant's individual culpability, or it shocks the conscience and offends fundamental notions of human dignity. (*People v. Hines* (1997) 15 Cal.4th 997, 1078; *People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

When evaluating the constitutionality of a punishment, the court examines the circumstances of the offense, extent of the defendant's involvement, manner in which the crime was committed, and consequences of the defendant's acts, as well as the defendant's personal characteristics, including age, prior criminality, and mental capabilities. (*People v. Hines*, *supra*, 15 Cal.4th at p. 1078.) On appeal, we view the facts in the manner most favorable to the judgment and resolve the issue as a matter of law. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) The "[d]efendant must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability. [Citation.] Therefore, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.' " (*People v. Em* (2009) 171 Cal.App.4th 964, 972.)

Dang's claim of unconstitutionality is unavailing. First, it does not shock the conscience that he was sentenced to an indeterminate term of 30 years to life for fatally stabbing his unarmed cohabitant. The sentence serves the legitimate purpose of protecting society from any further violent conduct by him. As noted, Dang's past criminal conduct was documented at the *Romero* hearing.

Second, the record before us does not compel a finding that his mental deficits were so severe that his moral culpability for the shooting was reduced. Dang told police that he had done wrong and he would be locked up. Further, Dr Di Francesca testified Dang had engaged in purposeful, goal-directed behavior when he went to the kitchen for

29

the knife. Notably, Dr. Nguyen testified Dang's mental health had improved after he began taking Risperdal. Lastly, Hsieh testified that in the year before the murder, Dang's judgment had improved to the point that she regarded it as "normal."

Third, even assuming Dang was viewed as less morally culpable due to his mild mental retardation, he has not shown that imprisonment for the remainder of his life is cruel or unusual punishment. The cases he has cited to support his argument are distinguishable. For example, in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2460, 2466-2469], the United States Supreme Court held that under constitutional proportionality principles, when sentencing juvenile offenders for murder, trial courts should not be required to impose life sentences without the possibility of parole, but rather should have the discretion to select (for example) life sentences with the possibility of parole based on the defendant's youth and the circumstances of the crime. *Miller* did not establish a blanket rule that a cognitively-deficient defendant who commits murder cannot constitutionally receive a sentence that does not allow for parole. (See *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. at pp. 2465-2470] [categorical bar on life without parole for juveniles applies only to *nonhomicide* offenses; homicide offenses committed by juveniles require individualized sentencing decision]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1389-1390 [discretionary life without parole sentence may be imposed on juvenile for homicide offense upon consideration of relevant factors].) Moreover, unlike juveniles—for whom mandatory life without parole sentences are precluded due to the prospects for rehabilitation as their brains develop (*Miller*, *supra*, 567 U.S. ___ [132 S.Ct. at pp. 2460, 2465-2468])—Dang has not shown his mental condition could be

30

improved to make him safe if released so as to constitutionally mandate consideration or imposition of a sentence that might realistically allow for his release.

Also, Dang's citations to cases precluding *death* sentences for mentally retarded persons and juveniles (see *Atkins v. Virginia* (2002) 536 U.S. 304, 318-321; *Roper v. Simmons* (2005) 543 U.S. 551, 568-575) do not advance his position because he was not sentenced to death. Indeed, sentences of life without parole—rather than death—have been deemed appropriate for mentally retarded or brain damaged defendants. (See, e.g., § 1376, subd. (c)(1) [intellectually disabled defendants who commit capital offense must be sentenced to life without parole, not death]; *Crook v. State* (Fla. 2005) 908 So.2d 350, 358-359 [for constitutional proportionality reasons, death sentence reduced to life without parole for brain-damaged defendant].) These sentencing dispositions implicitly recognize that in appropriate circumstances it is not cruel or unusual punishment to send a defendant with mental deficits to prison for the rest of his or her life.

DISPOSITION

The judgment is affirmed.


                                                    O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.